**SULLIVAN & LONG, INCORPORATED, et al., Plaintiffs–Appellants,**

v.

**SCATTERED CORPORATION, Defendant–Appellee.**

No. 94–2015.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1994.

Decided Feb. 8, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 13, 1995.*

---

* Hon. Ilana Diamond Rovner did not participate in the consideration of the rehearing en banc.

Jay A. Canel (argued), Peter M. King, Stephen D. Davis, Canel, Davis & King, Chicago, IL, Milo W. Lundblad, Flossmoor, IL, for plaintiffs-appellants Sullivan & Long, Inc., Joseph D. Lapota, Jr.

Michael B. Hyman, Carol V. Gilden, Much, Shelist, Freed, Denenberg & Ament, Clinton A. Krislov, Jonathan Nachsin, Krislov & Associates, Chicago, IL, for plaintiff-appellant Carole Bland.

Robert D. Allison, Chicago, IL, Jules Brody, Stull, Stull & Brody, New York City, for plaintiff-appellant James Hamburger.

Michael B. Hyman, Carol V. Gilden, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, Jules Brody, Stull, Stull & Brody, New York City, Clinton A. Krislov, Jonathan Nachsin, Krislov & Associates, Chicago, IL, Milo W. Lundblad, Flossmoor, IL, Perry J. Shwachman, Cin, Schwachman & Wagner, Chicago, IL, for plaintiffs-appellants Mark V. Harkins, Samuel Hooker, Charles Hawker, Audrey Hewitt, Anthony Hewitt, John Eckensten, Ronald J. Moran, Lesley R. Moran, Timothy J. Moran, Leon D. Ardelean, Jeffrey J. Sims, Sheffield Wolk, A.J. Blythe, Dorothy B. Nussdorf, Dan Chlipala.

Elizabeth D. Sharp, Paul A. Hybel, Thomas Kottler, LeLand W. Hutchinson, Jr. (argued), Freeborn & Peters, Chicago, IL, for defendant-appellee Scattered Corp., an Ill. Corp.

Before POSNER, Chief Judge, and COFFEY and MANION, Circuit Judges.

POSNER, Chief Judge.

This is an appeal from the dismissal, for failure to state a claim, of a suit that charges

violations of the securities laws growing out of a notorious, or at least newsworthy, episode of short selling of common stock of LTV Corporation. *In re Scattered Corporation Securities Litigation,* 844 F.Supp. 416 (N.D.Ill.1994); see, e.g., Kurt Eichenwald, "Stock Strategy under Scrutiny," *N.Y. Times,* Aug. 26, 1993, p. D1; Alexandra Peers & Jeffrey Taylor, "Chicago Broker Faces Inquiry over LTV Short Sales," *Wall St. J.,* Aug. 27, 1993, p. C1. The plaintiffs allege a "market manipulation" on an awesome scale that jeopardized the solvency of the Chicago (formerly Midwest) Stock Exchange. But like the district judge we have difficulty understanding what right of the plaintiffs the "manipulation" violated or how they were harmed.

LTV, a large steel producer, entered bankruptcy in 1986. In February of 1993 it announced a proposed plan of reorganization under which existing stock in the company would be replaced by new stock most of which would be issued to the bondholders and other creditors of LTV. Existing stockholders would receive warrants entitling them to purchase some of the new stock. The plan contained an estimate that the new shares would be worth only 3 or 4 cents. When the plan was announced, the old shares were trading for more than 30 cents. There were 122 million old shares outstanding.

The plan was confirmed by the bankruptcy court on May 27, 1993, and the court fixed June 29 as the last day on which the old shares would be tradable. Beginning before the confirmation date, but greatly accelerating on that date, the principal defendant, a Chicago Stock Exchange market maker (a dealer willing both to buy and sell a particular stock or other security for his account on a regular basis, 15 U.S.C. § 78c(a)(38)) with the alarming name of Scattered Corporation, sold short huge quantities of the old LTV shares. It sold short, in fact, tens of millions of such shares a week, for a total, when trading ended on June 29, of 170 million shares, far more than the 122 million old LTV shares outstanding. The excess of shares sold short over total shares outstanding is the focus of the plaintiffs' complaint.

A short sale is a sale at a price fixed now for delivery later. A trader sells stock short when he thinks the price of the stock is going to fall, so that when the time for delivery arrives he can buy it at a lower price and pocket the difference. If, for example, he sells the stock short at 50 cents a share, and the price falls to 40 cents before he delivers the stock, he can buy the stock for 40 cents a share, deliver it to the buyer, and have made a profit of 10 cents. Under the rules of the Chicago Stock Exchange, the buyer in a short-sale situation is entitled to delivery within five working days of the sale. If the seller fails to make delivery (maybe he doesn't have the stock), the rules entitle the buyer to "buy in" the stock, that is, to go out and purchase it on the open market and charge the price to the short seller. See *United States v. Naftalin,* 441 U.S. 768, 771 n. 2, 99 S.Ct. 2077, 2080, 60 L.Ed.2d 624 (1979). If in our example the price had risen by the end of five working days to 65 cents and the seller did not deliver, the buyer would go into the market, buy the stock at 65 cents, and charge the price back to the short seller. After the completion of the transaction, the buyer would have stock worth 65 cents that he had obtained at a net cost of 50 cents (50¢ + 65¢ − 65¢). Notice that a short seller's potential loss is unlimited, since it is simply the difference between the sale price and the market price—which could be anything.

The plaintiffs in this case were buyers on the other side of Scattered's short sales. They thought the price of the old shares would rise before plunging to 3 or 4 cents by June 29. (An old share would be worth that, rather than, as one might imagine, zero, because the holder of 100 shares was entitled to turn his shares in and receive 1.08 warrants to buy new shares at the rate of one warrant per share. The warrants, being worth approximately 100 times the old shares, were selling for between $3.125 and $4.125.) *Why* they thought this is a puzzle. Since on May 27 it was certain, or virtually so (nothing is *really* certain), that shares of common stock in LTV would be worth no more than 4 cents in just a month, it is unclear why the stock did not plunge immediately to that level. In fact it remained in the two-digit range for

quite some time, and on the very last day of trading was trading at 7.8 cents even though it was within hours of plunging to half that.

Scattered's counsel told us that the only reason the stock did not plunge immediately is that many brokers and investors do not read a plan of reorganization carefully—it is a long, complex, and jargon-ridden document—and hence many of them did not at first, or perhaps even at last, realize that the old stock in LTV would indeed be worth only 3 or 4 cents after the reorganization was completed. The problem may be endemic with reorganizations. Eichenwald's article suggests that many investors misunderstand the significance of news that a company is reorganizing. They see that the price of the stock is "low," and think that they are getting in on the ground floor rather than climbing aboard a sinking ship. See also Kurt Eichenwald "Being Nearly Worthless, Wang Shares, Of Course, Sell Briskly," *N.Y. Times*, Sept. 16, 1993, p. D8. Maybe the stock exchanges or the SEC should do something about these gullibles, since competition, which usually protects the uninformed purchaser, seems not to be working. Scattered, however, disclaims any legal responsibility for educating its buyers, and indeed has none, not being a fiduciary of the people it trades with. *Chiarella v. United States*, 445 U.S. 222, 233, 100 S.Ct. 1108, 1117, 63 L.Ed.2d 348 (1980). Its counsel acknowledged that his client hoped to take advantage of these people by selling them stock short. That is what short sellers do: they bet on a declining market, trusting that they have better information or better instincts than other traders, those who will buy from them. There is nothing unlawful about trading on an information advantage, provided that it is not based on inside information, *id.* at 233, 235, 100 S.Ct. at 1117, 1118; *Dirks v. SEC*, 463 U.S. 646, 654–55, 103 S.Ct. 3255, 3261–62, 77 L.Ed.2d 911 (1983); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495–96 (7th Cir.1986), which is not alleged. Scattered merely had a better understanding of the information about the reorganization than the investors with whom it traded. It was not even a matter of its having nonpublic information, though the cases we have just cited make clear that trading on nonpublic information is lawful unless it is inside information. It was a matter of a superior interpretation of public information, the information contained in the plan of reorganization.

The effect of trading on an information advantage is to dispel, by penalizing, ignorance and to bring market values into closer, quicker conformity with economic reality. The profit that such trading brings at the expense of less knowledgeable traders provides the incentive for a private, for-profit firm, such as Scattered, to provide this economic service.

Darwinian this process may appear to be, and yet how many (if any) of the plaintiffs resemble the proverbial widow and orphan, or other harmless prey? Sullivan & Long is the first-listed plaintiff. According to a magazine article that the plaintiffs cited in their complaint, "Mr. Sullivan, who is a member of the CSE's [Chicago Stock Exchange's] board of governors and is an owner of CSE member firm Sullivan & Long Inc., tried to use an arbitration strategy similar to Scattered's to profit from the difference in price between LTV's stock and warrants. But in late June, Mr. Sullivan, who was effectively betting that LTV's stock price would decline, became concerned that the price might rise when he discovered how large a short position Scattered had. He bought LTV shares to cover his own short position, and his firm incurred modest losses. In July, Sullivan & Long filed suit against Scattered...." Peter J.W. Elstrom, "Stock Probe Target Fights Back," *Crain's Chicago Business*, Aug. 30, 1993, pp. 3, 25. The article notes an allegation that Sullivan learned of Scattered's short position in his capacity as a governor of the Chicago Stock Exchange.

Scattered had no intention of delivering any of the LTV stock that it sold short. The last thing in the world that it wanted to do was to acquire and hold a stock that it believed certain to lose most of its value within weeks. Since it had no intention of buying any of the stock, it had no compunctions about selling short more LTV stock than existed. It ran the risk that the people on the other side of the short-sale transactions were right in betting that the price would

rise before its terminal plunge, that those people would go into the market and buy stock when the price rose during the five-day period for delivery, and that they would force Scattered to reimburse them for these purchases, as in our hypothetical example of the stock sold short at 50 cents that rises to 65 cents. This risk—the risk that, if the *Crain's* article can be believed, Mr. Sullivan flinched at—did not materialize, because the price maintained its downward course. There were few buy-ins, and Scattered ended up making more than $25 million from its campaign of short selling. The plaintiffs claim that Scattered ignored such buy-in demands as were made upon it, but this is imprecise. Scattered refused to deliver old stock in response to such demands, but did offer warrants on new stock. The amount of old stock that it had sold short represented fewer than 2 million shares of new stock. This was only a small part of the total equity capitalization of the reorganized firm. The vast majority of the new stock was to go to the debtholders of the old firm. It would not have been infeasible for Scattered to buy enough warrants to satisfy all potential buy-in demands with new stock. It would have been infeasible for it to obtain enough old stock to satisfy all such demands in old stock.

We can understand, therefore, Sullivan's flinching. The risk was enormous, precisely because Scattered had sold short more old LTV stock than existed. If all the buyers decided to buy in, and if Scattered were deemed not entitled to pay these buyers with warrants rather than with old stock, the price of the old stock would skyrocket—unless Scattered sopped up all this demand by continuing to sell short to these buyers. But at some point the buyers would worry about Scattered's ability to make good on all its promises to redeem its short sales. They would demand stock, not further promises to pay a high price if the stock rose in value. When this happened—this balking by the buyers—the plaintiffs would, until Scattered did go broke, be able to make money buying in the stock that Scattered had sold short to them. They say that Scattered prevented the price from rising (and thereby discouraged buy-ins by making them unprofitable) by selling short more and more stock. This

is just to say that Scattered, like a bluffer in a poker game, kept redoubling its bet until the other players lost heart. But so what? Scattered's principals may be reckless gamblers, sharpies, wise guys, exploiters of loopholes, even violators of the letter or spirit of the rules of the Chicago Stock Exchange. Cf. *United States v. Naftalin, supra,* 441 U.S. at 776–77, 99 S.Ct. at 2083–84. We take no position on these questions, except to note that the Chicago Stock Exchange has forbidden the practice in which Scattered engaged—that is, selling short without having borrowed the stock being sold short or having equivalent guarantees of delivery. But it did this after the short-sale spree that is the basis of this suit, and anyway not every stock exchange rule confers a private right to sue. *Spicer v. Chicago Board of Options Exchange, Inc.,* 977 F.2d 255, 262–66 (7th Cir. 1992).

What troubles us most about this suit is the plaintiffs' failure to identify any harm to the objectives of the securities laws under which they have sued; for that matter they have failed to identify a rule that Scattered violated. The central objective, we take it, is to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded. An efficient stock market is one in which stock prices reflect all potentially available information that is relevant to the economic value of the stocks. Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," 25 *J.Finance* 383 (1970). Not every practice that might reduce the efficiency of a stock market is prohibited; the securities laws compose a patchwork of rules rather than a seamless standard. But we would think twice before concluding that these laws prohibit "schemes" that accelerate rather than retard the convergence between the price of a stock and its underlying economic value and therefore promote rather than impair the ultimate goals of public regulation of the securities markets. Objectively, from May 27 on old shares of LTV stock were worth only 3 or 4 cents, and the defendant's cam-

paign of short selling helped move the market price toward that true value. Had the plaintiffs succeeded in *their* scheme of reselling for, say, 50 cents stock that they had bought for 40 cents but that was worth only 4 cents, they would have been contributing to an irrational gyration in stock prices.

The plaintiffs call what Scattered did "market manipulation," a term that refers to tactics by which traders, like monopolists, create artificially high or low prices, prices that do not reflect the underlying conditions of supply and demand. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). The only artificial prices, however, were the prices at which LTV stock sold between the confirmation of the plan and the expiration of the old stock. They were artificially high because they so greatly exceeded the stock's true value, which was only 3 to 4 cents. Far from launching a balloon, Scattered's short sales punctured a balloon, bringing prices down to earth where they belonged.

The name for what Scattered did is not market manipulation, but arbitrage. Arbitrageurs are traders who identify and eliminate disparities between price and value, or as in this case between today's price and tomorrow's price where the difference cannot be attributed to any prospective change in value. See *Falco v. Donner Foundation, Inc.*, 208 F.2d 600 (2d Cir.1953). By doing this, arbitrageurs promote the convergence of market and economic values that we suggested was the central objective of securities regulation. Consider a case in which the identical stock is selling for different prices on two exchanges at the same time. Since the value is the same, the prices should be the same. By buying stock on the exchange where the price is lower and reselling it on the other exchange, the arbitrageur brings about a convergence of price with value. This case is only a little subtler. The old LTV stock and the new stock that was to be issued when the plan of reorganization was implemented were not identical, but they were nearly so. The old stock was the stock until June 29, the new stock the stock thereafter. The two stocks were so far identical (putting aside the irrelevant difference in the

roughly 100 to 1 rate at which old shares were convertible into new) that any difference in price between them was more likely to reflect a failure of the stock market to work properly than a difference in underlying conditions of demand and supply. Scattered played the arbitrageur's role in trying to equate the prices of these two nearly identical goods. Arbitrage is not market manipulation. The opposite of a practice that creates artificial prices, it eliminates artificial price differences.

The plaintiffs complain that the defendant prevented them from profiting from their purchases by flooding the market with successive waves of short sales, thus keeping the market price from fluctuating upward from time to time ("capping the price," they call it). Such upturns would have enabled them either to buy in at a higher price than the short-sale price and thus make a profit, if they had bought from Scattered, or to sell at a profit stock that they already owned. But "flooding" a market with short sales is not a rational formula for keeping price falling. On the other side of each such sale is a buyer who thinks the market price will rise. If he is right, the short seller will lose money, and the more shares he has sold short, the more money he will lose. As we have already intimated, the short seller could sell so many shares short that his solvency was jeopardized. Suppose price rose and everyone who bought the shares sold short by Scattered tried to buy in. Since there would be more stock demanded than there was stock capable of being supplied, the price would soar and Scattered, which we are told was capitalized at only $1.5 million when the short selling began, would, unless it could redeem with warrants, soon go broke. But the plaintiffs are not complaining that if Scattered guessed wrong about the direction of the market, the price of the stock would rise *faster* than if Scattered had sold short fewer shares, for if that had happened the plaintiffs might have made money. And the threat of insolvency is one reason that buyers would have stopped accepting Scattered's offers to sell short, would instead have insisted on delivery or would have bought in and sought reimbursement from Scattered.

The plaintiffs analogize Scattered's plan to the scam in the movie *The Producers*. The "defendants" in that movie sold shares in a play to investors. They sold more than 100 percent of the shares, confident that the play—"Springtime for Hitler"—would be a flop, so that the investors would not ask for their share of the profits (there would be no profits). The play was a success, so the scam was exposed and they were sent to jail. Where the analogy fails is that while investors reasonably believe that the promoter will not sell more shares than exist, since he would then be defrauding the investors, a buyer of stock does not have a basis for equal confidence that the number of shares of a stock that is being sold short does not exceed the total number of shares in existence, since the seller is not trying to raise money for a venture. If even one share of a stock is sold short, there will be more shares actually or potentially for sale than there are shares in existence—since by definition the short seller does not own the share or shares that he is selling short—unless the short seller has borrowed stock in order to be able to make delivery if the buyer wants delivery. Scattered was not the only short seller of LTV stock. Apparently the first-listed plaintiff in this case also sold LTV stock short. If Scattered had sold only 85 million shares short, and other arbitrageurs had sold in the aggregate another 85 million, the imbalance between shares for sale and shares in existence would have been identical, unless the arbitrageurs borrowed the stock they sold short.

Granted, it is customary for a short seller to borrow the stock that he sells short; if he did not, the buyers would lack confidence that he could deliver, and might worry that if they tried to buy in, the short seller would not have the money to reimburse them. But the plaintiffs do not point us to, and we have not been able on our own to find, a law that *requires* arbitrageurs or other short sellers to borrow the stock that they are selling short. So the plaintiffs could not count on the volume of short sales being capped at the total number of shares outstanding. They were on notice that the sort of thing that did happen might happen, if there were any trader as audacious as Scattered. Being on notice, they were not deceived.

It is true that in 1994—a year after the short selling of LTV's old shares—the Chicago Stock Exchange adopted a rule requiring a short seller to borrow the stock sold short or provide equivalent guarantees of being able to deliver. *Self–Regulatory Organizations: Chicago Stock Exchange, Inc.*, 59 Fed. Reg. 42082 (Aug. 16, 1994). But that is too late to help these plaintiffs. A further complication is that, as we have mentioned, Scattered did have, so far as appears, enough warrants to deliver *new* stock to cover any demands for old stock, though we do not know whether responding to such demands in this way would have satisfied the short-sales rules of the Chicago Stock Exchange or for that matter the contracts of short sale. Since there is not as yet any requirement of public disclosure of short sales (hence the allegation that Mr. Sullivan abused his position as a governor of the Chicago Stock Exchange), see *Large Trader Reporting System*, 59 Fed.Reg. 7917 (Feb. 17, 1994); *Self–Regulatory Organizations: Notice of Filing of Proposed Rule Change by New York Stock Exchange, Inc.*, 60 Fed.Reg. 518 (Jan. 4, 1995), Scattered itself could not know the precise contribution that its short selling was making to the imbalance of which the plaintiffs complain.

We have thus far assumed that the short seller is not trying to deceive the market about what he is doing. The plaintiffs charge deception. They charge first of all that Scattered did not disclose that it had no intention of delivering any of the stock that it sold short. But if it was selling more shares than were outstanding, it could not deliver them—the requisite number of shares did not exist—so the plaintiffs' real complaint must be that Scattered did not disclose how many shares it was selling. But it was not required to disclose the number and the plaintiffs were not entitled to assume that Scattered would not sell more shares than were outstanding. Beginning on May 27, Scattered bought warrants so that it could deliver new shares to anyone who demanded delivery. The plaintiffs argue and we may assume for purposes of our decision that anyone who demanded delivery before June 29 would have been entitled to old shares.

That individual's remedy, when Scattered refused to deliver old shares, would have been to buy them in. Apparently no one bothered to do that. No one who bought from Scattered is complaining that it was not able to buy in old shares, so that the *Brennan* case on which the plaintiffs rely is inapposite. *Brennan v. Midwestern United Life Ins. Co.*, 286 F.Supp. 702 (N.D.Ind.1968), aff'd, 417 F.2d 147 (7th Cir.1969). No matter how many tens or for that matter hundreds of millions of shares Scattered sold short, it could not extinguish any of the outstanding shares and thus it could not defeat the right of the buyers, including the plaintiffs in this case, to buy in the old shares and if the price was higher than the price of the short sales to charge the price to Scattered and pocket the difference. And this is on the assumption that rule or contract required Scattered to deliver old shares, rather than warrants for new shares. If the latter form of compliance with the short-sale contract was permissible, the plaintiffs' case evaporates completely, since Scattered no longer would have been selling short more shares than existed.

The plaintiffs also complain that Scattered falsely marked its trading tickets "short exempt," meaning that Scattered was authorized to sell on down ticks in the market. (This means authorized to sell at a price equal to or below the last sale price, even if *that* price was equal to or below the next preceding sale price.) If Scattered was not exempt, it may have to answer to the Chicago Stock Exchange or the SEC, see SEC Rule 10a–1, but we do not see how its claim of exempt status could have deceived anyone in any respect that bears on this case. Exempt or not, a short sale is a short sale. If anything, the claim of exemption would lead investors to believe that Scattered was going to do *more* short selling than if it were not exempt, since exemption would free it from restrictions on short selling. And the plaintiffs' whole complaint is that they were fooled by the magnitude of the short selling that Scattered did.

■ Our analysis has shown that nothing alleged in the complaint is the kind of conduct that the securities laws are aimed at combatting. It is therefore not surprising that none of the plaintiffs' specific legal contentions has merit. They contend first and foremost that "by unprecedented massive short selling and by disguising the nature of their trades, the defendants controlled the price of LTV," in violation of section 9(a)(2) of the Securities Exchange Act of 1934. This section forbids "a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). As the plaintiffs themselves point out, the essence of the offense is creating "a false impression of supply or demand," for example through wash sales, where parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). There was nothing like that here. On the other side of all of Scattered's transactions were real buyers, betting against Scattered, however foolishly, that the price of LTV stock would rise. And Scattered made no representations, true or false, actual or implicit, concerning the number of shares that it would sell short. Maybe the plaintiffs' theory is that every short seller implicitly warrants that it won't sell short in such quantity as to jeopardize its financial solvency. This is an argument against short selling, or perhaps against short selling without borrowing the shares to be sold short—or perhaps against arbitrage. But other than in tender-offer situations, where short selling is prohibited, SEC Rule 14e–4 (formerly 10b–4; cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 934 (2d Cir. 1986)), there is as yet no rule barring persons with a pronounced taste for risk from trading on stock exchanges.

■ Since there was no deception—no *relevant* deception, for as we have said Scattered's claim to be exempt could only magnify the impression that it was selling short far more shares than it could deliver, and thus tend to dispel the deception of which the

plaintiffs complain—there is also no basis for a claim under Rule 10b–5, which requires proof of either deception or manipulation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994); *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988); *Chiarella v. United States, supra,* 445 U.S. at 232, 100 S.Ct. at 1116–17; *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 199, 96 S.Ct. at 1384. Deception there was not; and most forms of "manipulation" involve deception in one form or another. *Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 476–77, 97 S.Ct. at 1302–03. We have explained why no nondeceptive practice in which Scattered engaged was manipulative in the sense—the only possibly relevant legal sense—of bringing about artificial prices for LTV stock.

▪ As for the claim that Scattered violated section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l,* by becoming an issuer of LTV stock without registering the offer or sale as required by that Act, this is quite fantastic. Only LTV could issue LTV stock, although persons controlling LTV, as well as (conventional) underwriters, could also be liable for selling unregistered stock, see 15 U.S.C. §§ 77b(11), 77d(1), 77e, 77*l*(1)—but Scattered was none of these. The remaining claims—violation of RICO, unjust enrichment, and violation of an Illinois consumer protection statute—are either makeweights or depend on contentions that we have already rejected. The complaint fails to state a claim and the suit was therefore properly dismissed.

It was properly dismissed for another reason as well. The plaintiffs could not prove injury with the degree of certainty, low that it is, necessary to obtain an award of damages in a securities case. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Pelletier v. Stuart–James Co.,* 863 F.2d 1550, 1557–58 (11th Cir.1989). (They do not seek any other form of relief.) They bought stock that was selling for many times its actual value, hoping against hope that there were enough foolish investors to push the price up despite the imminence of its certain plunge. It is entirely speculative that but for Scattered's short selling, the plaintiffs would have sold at a profit or at a reduced loss before the price plunged to its value in the reorganization. The plaintiffs do not suggest that short selling in the stock of a firm undergoing reorganization is forbidden. Other traders might have seen the opportunity Scattered did, and their short selling might have driven the price sufficiently low to thwart any profit by these plaintiffs. It was not necessary that short selling drive the price all the way down to 7.8 cents (where it was when the music stopped), only that it drive the price below what it would have been had Scattered not sold short in such massive quantities. But to recapitulate the essential point of this opinion, since the conduct in which Scattered engaged appears to have served rather than disserved the fundamental objectives of the securities laws, we are not inclined to strain to find a violation of a specific provision.

AFFIRMED.