[Civ. No. 35640. Second Dist., Div. Four. June 8, 1970.]

PATRICIA ANN PIERSON et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Dwight E. Stevens and Howard E. Beckler for Petitioners.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood and Eugene D. Tavris, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**ALARCON, J.*—**The petitioners, Patricia Ann Pierson and Robert Pierson, seek a writ of mandate to require the Superior Court of Los Angeles County to vacate its order denying their motion to suppress evidence seized by the police in the search of (1) the Pierson residence, (2) the person of Michael (Mike) Levy, and (3) a pickup truck.

### FACTUAL BACKGROUND

An information was filed charging the petitioners with possession of heroin for sale (Health & Saf. Code, § 11500.5) and possession for sale of a restricted dangerous drug (Health & Saf. Code, § 11911). Pursuant to Penal Code section 1538.5 the petitioners obtained a de novo evidentiary hearing in support of their motion to suppress certain evidence claimed to have been seized illegally.

The evidence at the hearing consisted solely of the testimony of Officer Figelski, the arresting officer. He testified that he had been employed as a police officer, for seven years; that he was assigned to the narcotics division

*Assigned by the Chairman of the Judicial Council.

for a year and a half; that he had just left this division. It was stipulated that he was an expert in the field of narcotics.

Officer Figelski testified that, at about 10:30 p.m., November 18, 1968, he went to 12621 Debell, in the City of Pacoima, accompanied by Sergeant Colella of the narcotics division. A few days before that date he had received information from a female informant, whose name he disclosed, that a person by the name of Bobby Pierson was involved in the sale of heroin and methedrine from said location. The officer testified that the informant was a user of methedrine whom he had arrested a month or two prior to receiving the information from her, and that she had given him information previously on four or five other occasions which had resulted in arrests and seizure of contraband. The informant took the officer by the location, pointed it out to him, and described Mr. Pierson, stating that he lived at that address with his wife, "Patty," and a young baby. She said that numerous people went in and out of the location to buy narcotics; that she was in the location approximately a week to 10 days prior to November 18th and had seen numerous quantities of restricted dangerous drugs and narcotics. She told the officer that Pierson had received methedrine from a person named George Caputo, the latter person being known to the witness and to other officers of the narcotics division as a dealer in methedrine and other dangerous drugs. According to the informant, Pierson drove a green Chevrolet with customized paint job, or a black pickup truck. The informant said that as far as she knew Mrs. Pierson was not involved with the narcotics transactions that were taking place.

Prior to going to the location, Officer Figelski ran a record check and found that Mr. Pierson had a prior record which he believed was for burglary or receiving stolen property, and another arrest as a juvenile. He had no knowledge of a prior record as to Mrs. Pierson.

Officer Figelski testified that, when they arrived at the location, he walked towards the building and noticed two vehicles parked in the driveway, one of which was a black pickup truck. The other was a dark colored Chevrolet II Nova. Sitting in the passenger side of the Nova was the informant who had given him the above information. The officer testified that this was not a prearranged meeting with the informant, that it was accidental. He testified that, since there was no one else around, he spoke to the informant and asked her "Is Bobby inside?" and she stated that he was. He asked her if "Bobby was holding" and she replied "I believe so since Mike went in there to score," which, to the officer, meant Mike had gone into the residence to make a purchase of narcotics.[1] The officer testi-

---

[1]There were two preliminary examinations in this case, one on November 29, 1968, involving Mrs. Pierson and Mr. Levy, and one on March 11, 1969, involving

fied that he started to ask who Mike was "and at this time the front door opened and an individual came out. She said 'There he is.' " The officer was standing by the Nova, about 15 feet from the door, as this man exited from the residence and walked towards the car. The officer noticed that he had something clenched in his right hand but he could not see what it was. The officer walked towards this individual and said, "Mike," and the man said, "Yeah, who are you?" whereupon the officer stated that he was a police officer. The man, who at this time was three to four feet away, thrust his right hand into his pocket, backed away and turned towards the door of the residence. The officer grabbed him, and the man started yelling "Bobby, Bobby, run, it's the man" or "it's the narcs." This man, subsequently identified as Michael (Mike) Levy, was arrested for possession of heroin. At this time an altercation with Mr. Levy ensued when the officers attempted to subdue him. Officer Figelski left Officer Colella with Mr. Levy who was still struggling, and went to the front door of the house, which was then closed, and knocked upon the door, yelling, "Police officers, open the door."[2] At that time he could hear what he thought was running and a door slam. He stated that "I heard some additional moving and running. And at this time, coupled with the information I had and the observations I made, I formed the opinion that possibly somebody was trying to dispose of any contraband inside, and I forced entry." He forced the front door and as he entered he saw a male figure running through the kitchen and out the back door. He pursued him but lost him in the darkness. The officer testified that he could not identify this individual. When he came back into the house he took a quick look into the rest of the house to make sure there was no one else there. It was a "one-bedroom building." As he went through the house he saw Mrs. Pierson standing in the living room; he thought she had the baby with her. He then went outside to assist his partner in subduing Mr. Levy, who was then handcuffed and brought into the house. The witness testified that he

Mr. Pierson. Upon cross-examination, Officer Figelski admitted that at neither of the preliminary proceedings did he indicate that the woman in the Nova was his informant or that she told him that Mike was in the building to score; rather he admitted that he had previously testified that he went up to said vehicle, saw the woman seated therein, displayed his badge to her and identified himself as a police officer; that the woman told him that "her boyfriend Mike was in there to visit Bobby and Pat." On redirect examination he testified that at the time of the preliminary hearings he was attempting to protect the identity of this informant; that she had since been the victim of a homicide, which was the reason he revealed her identity at the 1538.5 hearing. Upon questioning by the court he stated that he did not wish to change any of his testimony given at the 1538.5 hearing.

[2]Upon cross-examination the officer admitted that at the preliminary hearing of November 29, 1968, he did not testify that he announced himself as a police officer when he went to the door of the house; that he said only that he yelled "open the door" and then forced entry.

then looked in Mr. Levy's right pants pocket, where Levy had been seen to thrust his hand, and retrieved five multi-colored balloons, the contents of which was a powdery substance which the officer said resembled heroin.

The officer then placed Mrs. Pierson under arrest for possession of heroin and searched the house.[3] In the bedroom on the floor, directly beside the bed, he saw a cannister which contained approximately two or three thousand yellow capsules, which appeared to be Nembutal; it also contained a white bag with a quantity of various types of capsules resembling Nembutal, Seconal and Tuinal, and rubber prophylactics containing heroin. The officers also obtained some other items, such as blank checks with the names of Mr. and Mrs. Pierson, bank statements, a Ruger revolver, a key to the front door and keys to the pickup truck. The pickup truck was also searched and from the bed of the truck they obtained a black overnight case, "inside of which were four brown jars containing a liquid. The jars were labeled with various chemicals, the type which I'm under the impression are used to make methedrine. There was also a brown paper bag which contained a large quantity of capsules which resembled Tuinal, Seconal and Nembutal. There were also, I think, three or four hype kits . . . ."

### PETITIONERS' CONTENTIONS

1. The credibility of the only witness produced by the People in opposition to the motion to suppress was impeached to such an extent that it was a denial of due process for the trial court to rely on such testimony in support of its conclusion that the searches and seizures were reasonable.

2. Each of the searches and seizures was without consent, without a warrant, and not incident to a lawful arrest.

3. The requirements of Penal Code section 844 were not complied with prior to the entry of the house.

4. The search of the truck was warrantless and unreasonable.

### THE TESTIMONY OF THE POLICE OFFICER WAS NOT INHERENTLY IMPROBABLE

Petitioners strongly attack the credibility of the sole witness, Officer Figelski, contending that, in view of his admission "that his testimony under oath at two previous preliminary hearings was either completely contradictory to his present testimony or was untruthful," the court was "duty

---

[3]On cross-examination, the officer admitted that at the preliminary hearing he testified that the search of the house was conducted prior to arresting Mrs. Pierson.

bound" to distrust his entire testimony; that it was an abuse of discretion for the trial court to base its ruling on such testimony and a denial of due process to petitioners.

Questions as to the credibility of witnesses and the weight to be given their testimony are for the trier of facts, and, although impeaching evidence in the nature of contradictions or otherwise has been received, it is the trier of facts who must determine to what extent testimony is to be believed or disbelieved. (*Hansen* v. *Bear Film Co.,* 28 Cal.2d 154, 184 [168 P.2d 946]; *People* v. *Castro,* 85 Cal.App. 228, 230 [259 P. 117].) In *Robinson* v. *Robinson,* 159 Cal. 203 [113 P. 155], it was contended by plaintiff-appellant that an analysis of the testimony of defendant as shown by the record made it appear that some of defendant's evidence was false, and that the court must therefore consider his whole evidence in the light of the rule declared by section 2061 of the Code of Civil Procedure, that "a witness false in one part of his testimony is to be distrusted in others." The court states (p. 204): "If we assume this claim as to what the record shows to be well founded, it still remains that the rule relied on is one solely for the guidance of the trial court and can have no pertinency in an appellate court. The trial court was the exclusive judge of all questions of credibility of witnesses and weight of evidence, and must be assumed to have considered all the evidence given in the light of such rules as are laid down by the law for the guidance of court and jury in the determination of questions of fact." In *People* v. *Holman,* 72 Cal.App.2d 75, 89 [164 P.2d 297], the court states: "The rule 'That a witness false in one part of his testimony is to be distrusted in others' (Code Civ. Proc., § 2061, subd. 3) 'is one solely for the guidance of the trial court and can have no pertinency in an appellate court.' [Citations.] The jury might have rejected all her testimony had they seen fit, in view of her admitted contradictions, but they were not *bound* to do so. Such 'testimony is still evidence in the case which they must receive and weigh. While they may reject it, they may, as they determine, accept as true one of the contradictory asseverations.' " In *People* v. *Avena,* 34 Cal.App. 500 [168 P. 148], the prosecuting witness and her sister both admitted that their testimony at the trial was directly contrary to that given by them at the preliminary examination, and was false. Their explanation of the change was that they had been told that if their father was convicted he would be sent to the penitentiary and they to the detention home or reform school. The court said: "It was for the jury to decide whether these contradictory statements, under all the circumstances and facts placed before the jury, so far impeached these witnesses as to render their testimony at the trial improbable or unbelievable."

An appellate court cannot substitute its judgment for that of the

trial court on the facts unless the testimony as to a particular fact "in the light of the undisputed facts, is so inherently improbable and impossible of belief as in effect to constitute no evidence at all." (*Romero* v. *Eustace*, 101 Cal.App.2d 253, 254 [255 P.2d 235]; see also, *Jeannerette* v. *Taylor*, 2 Cal.App.2d 568, 571 [38 P.2d 831]; *Gilmore* v. *Hoffman*, 123 Cal.App.2d 313, 319 [266 P.2d 833]; *Gackstetter* v. *Market Street Ry. Co.*, 10 Cal.App.2d 713, 718 [52 P.2d 998]; *People* v. *Bodkin*, 196 Cal.App.2d 412, 414-417 [16 Cal.Rptr. 506]; *People* v. *Swanson*, 204 Cal.App.2d 169, 172-173 [22 Cal.Rptr. 178].)

The testimony of the officer was impeached by inconsistencies in his testimony in the various proceedings relating to this matter. However, the petitioners do not contend, and the record does not reflect, that the testimony relating to the challenged searches and seizures at the evidentiary hearing now under review was inherently improbable.

### The Reasonableness of the Several Searches and Seizures

*The Search of the House.* An arrest and search may be made solely on the basis of information received from a single reliable informer. (*People* v. *Melchor*, 237 Cal.App.2d 685, 689 [47 Cal.Rptr. 235].) At the evidentiary hearing below, counsel for each of the petitioners conceded that the informant was reliable and the evidence amply supports such a conclusion. The petitioners argue that the People failed to present sufficient showing that the informer had personal knowledge of the facts which were relied upon by the police to justify their entry of the house to arrest the petitioner Robert Pierson as required by *Aguilar* v. *Texas*, 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]. This contention is without merit. The evidence shows that the informer advised the police that she had recently been on the premises and had seen large quantities of narcotics and restricted dangerous drugs. The information acted upon by the police included "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were" (*Aguilar* v. *Texas, supra*, 378 U.S. 108, 114 [12 L.Ed.2d 723, 729]), and was not based upon rumor or hearsay (*Spinelli* v. *United States*, 393 U.S. 410, 413 [21 L.Ed.2d 637, 641]).

Accordingly, upon arrival at said location, the police had probable cause to arrest Mr. Pierson. The testimony of the officer concerning the presence of the informer on the night of the 18th, who said that Mr. Levy had gone into the house "to score," the furtive movements of Mr. Levy when faced by the police officer and his shouted warning to Robert Pierson

were additional circumstances supporting probable cause. (*See People* v. *Verrette*, 224 Cal.App.2d 638, 643 [36 Cal.Rptr. 819].)

Can the search be upheld as an incident to the arrest of Mr. Pierson? ▇ It is the established rule that in the absence of some "grave emergency" (*McDonald* v. *United States*, 335 U.S. 451, 455 [93 L.Ed. 153, 158, 69 S.Ct. 191]), a search of a dwelling cannot be conducted without a warrant except as an incident to a lawful arrest therein. (*Chapman* v. *United States*, 365 U.S. 610, 613 [5 L.Ed.2d 828, 831, 81 S.Ct. 776]; *People* v. *Henry*, 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557].) ▇ There is no showing in the within record as to when or where Mr. Pierson was, in fact, arrested. The arrest was not effected at the time and place of the searches. Had the police been successful in arresting Pierson while in the act of leaving or escaping, the search of the house might have been proper as incident to that arrest. (See *People* v. *Rodriguez*, 238 Cal.App.2d 682 [48 Cal.Rptr. 117]; *People* v. *Pressley*, 242 Cal.App.2d 555, 559-560 [51 Cal.Rptr. 563].) The prosecution, however, has failed to show that such was the situation here. Under the facts before us the search of the house cannot be justified as an incident to the arrest of Mr. Pierson.

The principal argument made here by the People is that the search of the house was incident to the lawful arrest of Patricia Pierson. ▇ We have concluded that the totality of the circumstances known to the officer constituted probable cause for the arrest of Mrs. Pierson and justified the search of the house.

Officer Figelski testified that the informant told him that "as far as she knew Patty Pierson was not involved in any way with the narcotics transactions that were taking place" and "wasn't even aware of what was going on there . . . in connection with the sale or possession of narcotics." The record does not contain the underlying facts relied upon by the informant to support her conclusion that Mrs. Pierson was not aware of the presence of narcotics and restricted dangerous drugs in the house.

▇ In making an arrest upon information from a reliable informant, officers can justify their conduct only if the informant had personal knowledge of the arrested person's illegal activities. ▇ On the other hand, in deciding whether they have probable cause to make an arrest, law enforcement officers are not legally compelled to ignore factual information received from an informant together with their own independent observations merely because of the informer's unsupported legal conclusion that the suspect has not violated the law.

We must determine if the officers, at the time of arresting Mrs. Pierson,

had sufficient information to constitute reasonable cause to believe that she was in joint possession or had aided or abetted in the sale of narcotics or restricted dangerous drugs. If such reasonable cause is shown by the record before us we can disregard the informer's contrary conclusion.

"To establish unlawful possession of narcotics it must be shown that the accused had dominion and control over the contraband with knowledge of its presence and narcotic character. . . . To show such knowing possession the conduct of the defendant and the statements by him at the time of arrest may be sufficient. . . . 'Possession and knowledge may be proved circumstantially . . . exclusive possession of the premises is not necessary nor is physical possession of the drug of the essence.'" (*People* v. *Villanueva,* 220 Cal.App.2d 443, 449-450 [33 Cal.Rptr. 811].)

It is well settled that the mere presence of a person on the premises where the officers have reason to believe there are narcotics will not justify either his arrest or the search of his person. (*People* v. *Boyd,* 173 Cal.App.2d 537, 539 [343 P.2d 283]; *People* v. *Ramirez,* 185 Cal.App.2d 301, 306 [8 Cal.Rptr. 184]; *People* v. *Green,* 152 Cal.App.2d 886, 889 [313 P.2d 955]; *People* v. *Yet Ning Yee,* 145 Cal.App.2d 513, 516-517 [302 P.2d 616].)

However, "each case must be decided on its own facts and circumstances . . . and on the total atmosphere of the case." (*People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577].) Additional factors may supply probable cause. In *People* v. *Boyd, supra,* 173 Cal.App.2d 537, police officers received information that narcotics were being sold at a house occupied by defendant and one Christiansen; that the informant had made no purchases from defendant, but had made purchases from Christiansen in the presence of defendant, and that defendant was usually at the house at all hours. In the company of the police officers, the informant proceeded to the house in question and, while the officers watched, the informant went into the house and made a purchase from Christiansen. Failing in their attempt to apprehend Christiansen, the officers returned to the house, and finding the front door open, they entered. Defendant was found lying on the floor of the bedroom and was placed under arrest, and the house and grounds were searched. A bindle containing heroin was found in a match box in the pocket of defendant's shirt. Defendant stated to the officers that the shirt was his. In affirming the judgment of conviction, the court stated (p. 539): "The mere presence of a person on the premises where officers have reason to believe there are narcotics will not justify either his arrest or a search of his person. . . . However where, as here, there are additional factors such as defendant's residence at the

premises in question and his presence there when sales of narcotics were made, such evidence would appear to reasonably justify the belief that defendant had committed a felony."

In *People* v. *Ramirez, supra,* 185 Cal.App.2d 301, the police had received complaints from neighbors as to the amount of traffic at all hours of the day and night in the vicinity of 1712 East 62d Street, and had also received statements from addicts who were being processed for narcotic charges, that they had obtained their narcotics from "Chello on 62nd Street." While the officers had the premises under surveillance they observed Joe H. Lopez, a known narcotic addict, enter the premises, remain two or three minutes, and then depart. The officers followed Lopez and saw some pink tissue paper leave Lopez' hand and fall to the ground near his foot. In the paper were three gelatin capsules containing a powdery susbtance which appeared to be heroin. Lopez was arrested. The officers then returned to 1712 East 62d Street and arrested both Mr. and Mrs. Ramirez, who were seated at the kitchen table, and searched the appellant (Mr. Ramirez). In holding that there was reasonable cause for the arrest of Mr. Ramirez, the court stated (pp. 306-307): "[I]t is clear that the officers understood that Mrs. Ramirez, and not the appellant, was known as 'Chello.' While the appellant was seen to put a white object in his mouth, the officer quickly examined his mouth and found that the object was a piece of bread. Consequently, the determinative factor would appear to be the weight to be given to the fact that Lopez, a man having a record as an addict, was seen to enter the premises, stay a short while, and then depart, having narcotics in his possession as the officers approached him. The Lopez incident lent weight to the information previously possessed by the officers . . . and justified their reliance on the information they had theretofore received from anonymous sources. . . . In view of the knowledge they had acquired, it was reasonable for the officers to form the belief that Lopez had obtained narcotics in the premises at 1712 East 62nd Street.

"While Mrs. Ramirez has not pressed her appeal, it seems clear that if she were the person here involved, the arrest and search of the premises for narcotics could not be claimed to have been unlawful. . . . The problem presented with respect to the arrest and search of the defendant is a more difficult one. It is, of course, clear that the mere fact that a person is on premises where officers have reason to believe there are naroctics will not justify either his arrest or a search of his person. . . . But in the present case there was more than mere presence or association. The appellant was not attired in the usual garb of a mere visitor. When Officer Velasquez saw Mr. and Mrs. Ramirez seated at the kitchen table, it was reasonable for him to believe that they had been joint participants in

dealing with Lopez and that the appellant was more than a mere bystander. This conclusion finds support in the reasoning of the court in *People* v. *Soto,* 144 Cal.App.2d 294, at page 300: 'As already pointed out, if Garcia were the defendant in the instant case, the search would clearly have been a legal one. But he is not. Soto, a man the police officer, until his entry, did not know was in the room, is the defendant. Does that make any difference? Did the police have reasonable grounds to believe that Soto had committed a felony?

" 'There can be no doubt that under some circumstances the fact that the police have reasonable and probable belief that the known occupant of a room or house has committed a felony will not justify the search or arrest of a casual visitor to that room or house. . . . But the rule is not absolute. Each case must turn on its own facts. The test is whether the police had reasonable cause for believing that the person arrested, whoever he may be, has committed a felony.

" 'In the instant case, for reasons already stated, the police officers had reasonable grounds to believe that the person or persons in Room 37 were in possession of narcotics. He had reasonable grounds to believe that the occupant or occupants of that room were committing a felony. The police officer thought that Garcia, the registered occupant of the room and who was known to the officer, was the culprit. But when the defendant Soto opened the door to the room, and the officer saw him in his bare feet, with Garcia asleep in the bed, he could reasonably conclude that Soto was not a mere innocent bystander or casual visitor. The officer had learned from Shuck that Shuck had just used narcotics in the room and that more narcotics were still there. The officer could reasonably conclude that Soto, the man who answered the door, had been in the room while Shuck had used the narcotics, and had furnished them to him. Accordingly, there existed "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion, that the person accused is guilty." (*People* v. *Smith,* 141 Cal.App.2d 399, 402 [296 P.2d 913].)' "

In *People* v. *Nichols,* 1 Cal.App.3d 173 [81 Cal.Rptr. 481], the officer knocked and defendant opened the door; the officer smelled an odor of marijuana smoke. The court stated (pp. 175-176): "The odor of marijuana justified the officer's belief that marijuana was in the house. . . . The fact that defendant opened the door and acknowledged that he lived there supported the belief that he was jointly or constructively in possession of any narcotics which were inside. . . . Courts have recognized that it is reasonable for an officer to infer that the person in apparent possession

of a dwelling place is in possession of the narcotics found there, even though that possession may be shared with someone else. (See, e.g., *People v. White, supra,* 71 Cal.2d at p. 83.) The drawing of such an inference by the investigating officer, and by the court which receives the evidence, raises no constitutional issue."

Under comparable facts, in ruling on the sufficiency of the evidence to sustain a conviction, the Supreme Court held in *People v. White,* 71 Cal.2d 80, 83 [75 Cal.Rptr. 208, 450 P.2d 600]: "Here the recited evidence is sufficient to support the conviction. The evidence that marijuana was found in defendant's bedroom in which he had admittedly been within a few hours before the search raised a reasonable inference that the marijuana was his even though he shared the room with another. . . . From the evidence the trier of fact could properly conclude that defendant had knowledge of the presence of the marijuana . . . and the mere possession of a narcotic constitutes substantial evidence that the possessor of the narcotic knew of its nature."

In the instant matter we are concerned with probable cause for an arrest and not with the sufficiency of the evidence to support a conviction. It is our view that, under these facts, a prudent man in the position of these officers, knowing what they knew and seeing what they did, would have reasonable cause to believe and to conscientiously entertain a strong suspicion that Mrs. Pierson was in joint possession of narcotics and restricted dangerous drugs and had aided and abetted the sale of narcotics and dangerous drugs. Mrs. Pierson was not a mere casual visitor on the premises. She shared a one bedroom dwelling with her husband. The police had reliable information that large quantities of narcotics were kept on the premises, and numerous persons went in and out of that location to buy narcotics. Just before the police entered they were informed that Mr. Levy had just entered to purchase narcotics. She and the person who escaped were the only persons in the house when the police entered. Under these circumstances it was reasonable for the police to draw the inference that she had knowledge of the presence and nature of the narcotics and restricted dangerous drugs. The search of the house was reasonable as an incident to the arrest of Mrs. Pierson.

*The Search of Mr. Levy.* Prior to the time Mr. Levy exited the house the police did not have probable cause to arrest him. The record discloses that the police informant had told them that Mr. Levy had gone in "to score." However, no facts were related to the officers by the informer to show the basis for this conclusion. We do not know whether Mr. Levy told the informer he was going in to score or whether this was a mere

assumption based on the informer's past experience and information concerning Mr. Pierson and Mr. Levy. The informer's report by itself did not constitute reasonable cause to arrest Mr. Levy. However, the police in the instant matter had additional information which independently corroborated the informer's tip. The police had been reliably informed that the Pierson residence was the scene of numerous sales of narcotics and restricted dangerous drugs. Mr. Levy had appeared at the Pierson residence in the company of a known user of methedrine. "Association in a noncriminal context with one known to have been previously arrested for a narcotics violation is not enough in itself to establish reasonable ·cause . . . but can be considered by the arresting officers." (*People* v. *Gaines,* 265 Cal.App.2d 642, 647 [71 Cal.Rptr. 468].) When Mr. Levy walked out of the Pierson residence he had an object clenched in his fist. When the police officer identified himself, Mr. Levy thrust his hand in his pocket, retreated from the police and shouted a warning to "Bobby" that narcotics officers were present. All of these circumstances fully substantiated the informer's statement (see *People* v. *Melchor,* 237 Cal.App.2d 685, 693 [47 Cal.Rptr. 235]), and constituted reasonable cause to believe that Mr. Levy was then in possession of a narcotic or a restricted dangerous drug. (See also *People* v. *Currier,* 232 Cal.App.2d 103, 107 [42 Cal.Rptr. 562].)

## Was Compliance with Penal Code Section 844 Excused

 Full compliance with the requirements of Penal Code, section 844 was excused in the circumstances of this case and forced entry was justified. Mr. Levy's shouted warning clearly alerted the occupants of the house to the approach of the police, and suggested that contraband be destroyed or that "Bobby" escape. At this point the police had probable cause to arrest Mr. Pierson, and had reason to believe he was within the house or was about to escape. The reaction from within the house when the officer knocked upon the door, i.e., the sounds of someone running and the slamming of a door, gave the police reason to believe that further compliance would permit the destruction of evidence or frustrate an arrest. (*People* v. *Maddox,* 46 Cal.2d 301, 305-307 [294 P.2d 6]; *People* v. *Carillo,* 64 Cal.2d 387, 391-392 [50 Cal.Rptr. 185, 412 P.2d 377]; *People* v. *De Santiago,* 71 Cal.2d 18, 28-29 [76 Cal.Rptr. 809, 453 P.2d 353].)

## The Search of the Truck

 Had the police arrested Mr. Pierson upon entering the residence there might have been reasonable cause to search the pickup truck

parked in the driveway as an incident to his arrest (see *People* v. *Cruz,* 61 Cal.2d 861 [40 Cal.Rptr. 841, 395 P.2d 889]), because of the informer's report that Mr. Pierson *drove* a black pickup truck. No evidence was presented to show to whom the pickup truck was registered. Nor was any proof offered to establish reasonable cause to believe that the pickup truck was used to transport narcotics or restricted dangerous drugs or that it contained any contraband prior to the search of the vehicle. No evidence was presented to connect Mrs. Pierson to the ownership or possesion of the pickup truck or to show her knowledge of its contents. Nor was there any evidence to tie in Mr. Levy to the truck. Accordingly, the search of the truck cannot be justified as an incident to the arrest of Mrs. Pierson or Mr. Levy.

The trial judge properly denied the motion to suppress evidence seized within the residence and from Mr. Levy's person. The trial court erred in denying the motion to suppress the evidence found within the pickup truck.

The alternative writ of prohibition is discharged. Let a peremptory writ of mandate issue directing the respondent court to grant petitioners' motion to suppress the evidence obtained as a result of the search of the pickup truck. In all other respects the petition is denied.

Kingsley, Acting P. J., and Dunn, J., concurred.