Filed 12/9/13  Fuller v. Neyenhuis CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KENNETH W. FULLER,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>DAN NEYENHUIS,<br><br>    Defendant and Respondent. | G047690<br><br>(Super. Ct. No. 30-2010-00416083)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Geoffrey T. Glass, Judge.  Affirmed.

Thomas Vogele & Associates, Thomas A. Vogele and Timothy M. Kowal for Plaintiff and Appellant.

theDewberryfirm and Robert H. Dewberry for Defendant and Respondent.

\*            \*            \*

INTRODUCTION

Back in 2008, John Turpin was involved in two investment real estate purchases, with two separate partners. One purchase was of a house in Sunset Beach with Kenneth Fuller. The other purchase was of a lot in Corona Del Mar with Dan Neyenhuis. But the house purchase in Sunset Beach was never consummated. Instead, Turpin forged Fuller's signature on instructions to abort the escrow and had $750,000 of borrowed money already placed in the escrow disbursed to himself. Turpin never paid back the money taken from the escrow, which left Fuller obligated to the lender.

By contrast, the Corona lot purchase was completed, in part because Turpin managed to come up with his $265,000 half of the $530,000 down payment: He directly contributed $102,000, plus he arranged to borrow another $163,000. Neyenhuis was good for his own $265,000 share of the down payment, so the deal went through. Even so, Neyenhuis and Turpin both lost money when the property was later sold for a loss in 2010.

This lawsuit represents Fuller's effort to recover from Neyenhuis some of the money which Turpin's forgery cost him. Fuller's main legal theory is that section 16305 of the Corporations Code makes Neyenhuis responsible for Turpin's putative ill-gotten capital contribution to the Turpin-Neyenhuis partnership, because Turpin's obtaining money from the Turpin-Fuller partnership under false pretenses was a tort in the course of the Turpin-Neyenhuis partnership's business.[1] Fuller's secondary legal theory is that Turpin's capital contribution was a fraudulent transfer to Neyenhuis. (See Civ. Code, §§ 3439.04, 3439.05.)

The case went to a trial before the court, and Fuller lost. The trial court found the money which Turpin contributed to the Corona del Mar lot purchase didn't come from the funds Turpin had stolen from Fuller, and even if it did, section 16305 did

---

[1] All undesignated statutory references in this opinion are to the Corporations Code.

2

not apply because Turpin's stealing from Fuller was not part of the "business" of the Turpin-Neyenhuis partnership.

We affirm. Substantial evidence supports the trial court's factual finding about the actual source of the funds for Turpin's contribution to the Corona Del Mar lot purchase. And section 16305 does not contemplate partners being responsible for the origins of other partner's capital contributions.

FACTS

1. *The Turpin-Fuller Sunset Beach Deal*[2]

Turpin was among four witnesses called in the case, all by plaintiff Fuller. Turpin's trial testimony established that in 2008 he and Fuller were partners in a deal to buy a house on South Pacific in Sunset Beach. Part of the deal involved Turpin and Fuller together borrowing $1 million from a physician, Dr. Howard Moran, to buy the property. The money was transferred by Moran writing various checks to Turpin, who then deposited them into the existing escrow. By June 3, 2008, there was already $1 million of Moran's money in the escrow, which both Turpin and Fuller were obligated to repay. On that date, however, Turpin scuttled the escrow by forging Fuller's name to escrow instructions telling the escrow holder to distribute $750,000 to Turpin.[3]

The $750,000 was disbursed in the form of a check payable to Turpin. Turpin put the cashier's check into his wife's account, and the same day had the bank

---

[2] The record is sparse, consisting mostly of the reporter's transcript of the trial in this case, the reporter's transcript of the trial in another case, and an appellant's appendix which contains some of the records from Turpin's bankruptcy. Fuller did not arrange for any of the exhibits used at trial of this case to be transmitted to this court, and there were a number, as review of the reporter's transcript shows. As such, Fuller cannot complain that evidence contained in those exhibits is not mentioned in this opinion. (See Eisenberg et. al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 4:4.2, p. 4-3 ["Appellant cannot argue that trial exhibits (whether admitted into evidence, rejected or lodged) undermine the judgment when those exhibits are not *transmitted* to the appellate court."].) We note in this regard, however, that Fuller's briefing makes no explicit reference to any exhibits, so it appears Fuller did not intend to rely on them in this appeal.

[3] Turpin objected to the verb "forged" to describe his action, though he did admit to using Fuller's signature without Fuller's permission to obtain the money. A false signature without permission smells just as bad by any other name, but it looks like forgery to us.

3

issue a cashier's check for $720,000 to himself. He testified he was hoping to reopen the Sunset Beach escrow with the money, though of course that never happened.[4]

Turpin testified the money "sat in [his] drawer" for a while, but eventually got "disbursed to different items, different projects" by means of cashing the check and then taking it out in the form of cash and cashier's checks. However, his testimony was clear that he did not take the check to the bank until sometime in November or December of 2008.

It was not until March 2009 that Turpin confessed to Moran and Fuller his withdrawal of the $750,000 from the Sunset Beach escrow. That revelation would lead to litigation initiated by Moran and Fuller to recover the money from Turpin, and to Turpin's chapter 7 bankruptcy.

2. *The Turpin-Neyenhuis Corona Del Mar "Partnership"*

The Turpin-Neyenhuis agreement that resulted in the sale of the Corona Del Mar lot to Neyenhuis[5] traces its origin back to 2004, when Turpin and Tom Peterson opened an escrow to purchase a lot on Hazel Street in Corona Del Mar. Peterson was to be the ostensible buyer; Turpin was the silent partner. Peterson, however, backed out of his share of the deal and wanted to assign his right to buy the property to Neyenhuis, who, at the time, wanted the property to build his own dream house on. The seller, however, balked at selling to Neyenhuis as sole owner and so reneged on the deal. Turpin and Neyenhuis then sued the seller for specific performance. That lawsuit was settled sometime in July or August 2008, after a mediation. The settlement resulted in the price of the property going up from its original $2.155 million to $2.4 million.

---

[4] His gameplan was that the seller of the Sunset Beach property would "carry back" a $3 million loan which, though he never explained precisely how, would give him access to enough money to "have covered everything."

[5] Turpin testified his modus operandi was to participate in the equity of an investment property but not to be personally on title.

By the summer of 2008 Neyenhuis had soured on the prospect of building his dream house on the Corona Del Mar lot, and in the interim had built it on other property he owned on Poppy Street. He simply wanted to resell the property for a small profit. Even by the summer of 2008 Neyenhuis still entertained hopes of getting about $2.8 million for it.[6]

Turpin's financial participation in the purchase of the Corona Del Mar lot up to the summer of 2008 appears to have been minimal. The testimony from both Neyenhuis and Turpin is vague on precisely how much Turpin had contributed up to the summer of 2008. The money that initiated the purchase back in 2004 – about $60,000 – had come from Peterson. However, at the time of the mediated settlement, the two men came to a verbal agreement to the effect that Turpin would pay half the attorney fees that got them to that point, plus half of the $530,000 down payment. If there was to be any profit on the deal, they would split it evenly. They also agreed they would split half the "carry" – meaning the monthly cash flow necessary to keep the property until it sold – a sum that amounted to about $11,000 a month. Escrow closed in mid-October, 2008.[7]

How did Turpin come up with his $265,000 half of the $530,000 down payment? According to Turpin's testimony at trial, it came from two sources. One source was a loan for $163,000 from Robin Singer and Steve Strickler.[8] (Both testified at trial corroborating the loan.) The money came via a second mortgage (in effect Turpin

---

[6]    The legal fees to bring the transaction to the point where Neyenhuis and silent partner Turpin could buy it for $2.4 million had been initially around $400,000, but were ultimately reduced, after Neyenhuis complained about overcharging, to about $60,000.

[7]    This is one of those details where, because of the sparsity of the appellate record furnished us in this appeal, there is some slight room for inexactitude. Again, we didn't get the exhibits, and it is the appellant's job to insure their transmission to the Court of Appeal, or take the consequences. We note there are statements from Neyenhuis' testimony that indicate escrow closed either October 10, 2008, or October 16, 2008.
       As between the two on this sparse record, the implied finding of the trial court would have to be considered to be October 10, the earlier date, because of Turpin's testimony that he did not take the $720,000 cashier's check from the Sunset Beach escrow to the bank until November at the earliest.

[8]    Most of the main actors in this case – lender Moran on the Sunset Beach property, lender Steve Strickler (Singer's husband) on the Corona Del Mar property, Neyenhuis, Fuller and Turpin, all knew each other through a Newport Beach cycling club.

5

was borrowing part of his share of the down payment), which meant – in effect – that Neyenhuis was also obligated on the note.

According to Turpin's trial testimony, the remaining $102,000 came from a loan from David Coleman for $125,000. Turpin testified that in October 2008 he was "continually borrowing equity from all of the properties that I owned with Mr. Fuller." Neyenhuis was very clear in his testimony that he had no idea of the source of the money that constituted Turpin's $265,000 contribution.

Fuller confronted Neyenhuis in the spring of 2009 with the assertion Turpin had stolen from Fuller the money Turpin had contributed to the Corona Del Mar purchase. When confronted, Neyenhuis said Fuller was welcome to Turpin's share and could step into Turpin's shoes. Fuller did not take advantage of this opportunity.

The Corona Del Mar property was eventually sold for a loss in 2010, with Neyenhuis ending up paying off the Singer note himself. He testified he lost about $1 million on the purchase and later resale of the property.

3. *The Litigation*

Litigation commenced when Moran sued Turpin and Fuller for the $1 million they owed him on the aborted Sunset Beach deal. After Turpin filed for bankruptcy, Fuller filed this case against Neyenhuis. After a short trial, the judge found that none of the money resulting from Turpin's forgery of Fuller's signature on escrow instructions made its way into the Turpin-Neyenhuis Corona Del Mar purchase. Moreover, the judge ruled that section 16305 did not apply to any Turpin-Neyenhuis partnership because the origin of Turpin's capital contribution was independent of the business of the partnership.

6

DISCUSSION

A. *The Standard of Review and the Impeachment of Witnesses*

It is a commonplace in appellate procedure that many cases are won or lost because of the applicable standard of review. This case is certainly one of them, and that is best illustrated by considering the second of the three arguments Fuller raises on appeal first.

Fuller's second argument is the trial court "failed to consider" evidence that Turpin had "commingled" Fuller's money. "Commingled," of course, is one of those verbs that requires something else – you can't commingle just one thing. One must ask, "commingled" with what? The implied answer from Fuller's briefing is that Turpin "commingled" Fuller's money with the money Turpin used to contribute to the Turpin-Neyenhuis partnership. As we have already mentioned (and as shown in more detail in our statement of facts), there was substantial evidence that *none* of the money Turpin contributed to the Turpin-Neyenhuis partnership came from Fuller.

Fuller's argument about commingling is completely based on prior inconsistent statements made by Turpin in another case, which were read to Turpin while he was on the stand in this case. Those statements were susceptible of the inference that at the time Turpin made his contribution to the Corona Del Mar lot purchase, the only money he actually had was the money taken from the Sunset Beach escrow.

As presented to us, then, Fuller's argument is not really that the trial judge "failed to consider" the evidence Turpin had "commingled" Fuller's money with money that went to the Turpin-Neyenhuis partnership, but that the trial judge was required to *believe and credit* that evidence. And the answer to that assertion is: No, he wasn't.

It has long been established under California law that a witness at a trial may be impeached with his or her prior inconsistent statements, but the trier of fact may *still* choose to disbelieve the prior inconsistent statements, and accept all or part of the witness's in-court testimony. (See *People v. Maxwell* (1979) 94 Cal.App.3d 562, 576

7

["'"'The jury might have rejected all her testimony had they seen fit, in view of her admitted contradictions, but they were not bound to do so. Such 'testimony is still evidence in the case which they must receive and weigh. While they may reject it, they may, as they determine, accept as true one of the contradictory asseverations.'"'"]; *Pierson v. Superior Court* (1970) 8 Cal.App.3d 510, 517-519 [rejecting argument that sole prosecution witness at preliminary hearing was so impeached by his testimony at two previous preliminary hearings that the trial court could not "rely" on the witness's "present testimony"]; *People v. Ross* (1941) 46 Cal.App.2d 385, 396-397 [jury knew witness "had been impeached" and knew "they had a right to reject his testimony entirely," but even so the question of the witness's "credibility and of the weight to be given to his testimony were to be determined solely by the jury"]; *People v. Holman* (1945) 72 Cal.App.2d 75, 89-90; [holding jury could still rely on parts of testimony of witness which was otherwise "self-contradictory"]; accord, *Estate of Odian* (2006) 145 Cal.App.4th 152, 168 [the "testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence, and we must defer to the trial court's determination that these witnesses were credible"]; CALCRIM No. 226 ["You may believe all, part, or none of any witness's testimony . . . . Do not automatically reject testimony just because of inconsistencies or conflicts."].)

Significantly for this case, there is no formal statement of decision. To be sure the trial judge did provide a comprehensive oral statement of his reasoning from the bench, but there's a big difference between that and a formal statement of decision. When there is no formal statement of decision, the appellate court *must* infer a finding in favor of the judgment on any controverted issue. (E.g., *Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 645; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267 ["Particularly pertinent here, and not addressed by either side, is the doctrine of implied findings. This doctrine requires that in the absence of a statement of decision, an appellate court *will presume that the trial court made all factual findings necessary to*

8

*support the judgment for which substantial evidence exists in the record.* In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." (Fn. omitted, italics added.)].)

In short, Fuller's second argument fails because we are required to assume the trial court *did* consider the evidence of Turpin's commingling of funds taken from Fuller with funds that went to the Turpin-Neyenhuis partnership. The court just didn't find that evidence to be true. As a result, the standard of review that governs our rendition of the facts is the basic, garden-variety rule that, after a court trial, all conflicts in the evidence and all reasonable inferences to be drawn from the evidence must be drawn in favor of the winning party. (E.g., *Capo for Better Representation v. Kelley* (2008) 158 Cal.App.4th 1455, 1464 ["coming to this court from a court trial, all conflicts and inferences must be resolved in favor of the judgment"].)

B. *Commingling Argument*

Fuller also suggests the trial judge should have used a "first in, first out" system of accounting for "commingled" money. This argument fails because there is substantial evidence showing the money that was truly "first in" was Coleman's $125,000, loaned to Turpin sometime prior to mid-October 2008, not Fuller's. This amount, in the form of a cashier's check, was not taken to the bank until November at the earliest. It appears the trial judge *did* use a "first in, first out" system in finding against Fuller.

C. *Source of Funds Argument*

We now turn to the main legal argument made by Fuller. He contends Neyenhuis could not willfully blind himself to the source of Turpin's contribution to the

9

Turpin-Neyenhuis partnership.[9]  But his argument has several flaws.  First, the factual predicate on which it is based – the assumption the money that constituted Turpin's share of the partnership was stolen from Fuller – was rejected as a factual matter by the trier of fact.

Second, contrary to Fuller's assertion that the appropriate standard of review is de novo because the issue is whether the trial court misapplied the law, the correct standard of review is substantial evidence, as shown in the most recent case explicating section 16305 (and the one that features most prominently in both sides' briefing), *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384.  *PCO* is unmistakably clear that the question of whether a partner's actions "were within the scope of his authority is ordinarily a question of fact." (*Id.* at p. 392.)

We have already recounted the substantial evidence that Turpin's action in forging Fuller's name to escrow instructions were completely independent of the Turpin-Neyenhuis partnership.  The trial court believed Turpin got $163,000 from Singer and Strickler and $102,000 from Coleman,[10] and there is no basis in law by which we, as an appellate court, can override the trial court's credibility call on that point.  But even if we could, the trial court's conclusion was by no means impossible, improbable or even merely implausible.  It is common knowledge that wheeler-dealers whose investment empires may be technically bankrupt can still raise money between the first manifestation of financial trouble and the time when their empires slip, like the Titanic, under the water. (E.g., *Brouwer v. Raffensperger, Hughes & Co.* (7th Cir. 2000) 199 F.3d 961, 963 [company in financial trouble sold notes in order to pay interest and principal on

---

9        Both parties have briefed the case on the assumption the oral agreement which Turpin and Neyenhuis made really constituted a general partnership (obviously it couldn't have been a limited one because it wasn't written down).  Likewise we will assume the relationship was a general partnership, but we do not decide that issue.

10        The balance of Turpin's contribution came from the Singer loan, and Neyenhuis himself got stuck with that obligation.

previously sold notes and to finance the sale of yet more notes, all before it declared bankruptcy a few years later].)

We also agree with the trial judge's legal analysis of the scope of section 16305. The judge, in fact, pinpointed why Fuller's theory of the statute reduces to absurdity by alluding in his comments from the bench to the hypothetical of a law partnership. We will add our own gloss to the hypo. If a law partnership were to offer to let a solo practitioner join the partnership for, say, a $50,000 cash buy-in and the solo practitioner came up with the money by looting a client's trust fund, it would be unthinkable that the "business" of the ongoing partnership included the looting. Fuller cites us to no case holding that the "business" of a real estate partnership is to defraud the sources of the capital contributions to that partnership.

The *PCO* case certainly doesn't change our thinking. That case was like something out of "The Producers."[11] A client solicited funds from investors for the purpose of forming a fund whose purpose was supposedly to buy customers' life insurance equities (called "viatical settlements"). (See *PCO, supra*, 150 Cal.App.4th at pp. 388-389.) In reality it was a scam just to get the investors' money, and the client ended up, literally, with "bags" of it. (*Id.* at p. 389.) Just as the client was being apprehended by the police, a lawyer for a law firm ended up leading a party of the clients' associates to his home to take possession of the bags of money which were used to allow the client to make bail and (no surprise) pay legal fees. (*Id.* at pp. 389-390.) The issue in the case was whether the absconding of the bags of money occurred in the course of the law firm's partnership business, and the court held, yes, the malfeasance did so occur, because arranging for bail and representing a client in the early stages of a

---

[11] Both a Broadway musical and a movie centered on an investment scam, where two "producers" sell far more than 100 percent of the shares in a Broadway show to gullible investors, on the theory the show will be *so* bad it is bound to fail on opening night, giving the producers the opportunity to flee with the balance of the investors' money. (See *Sullivan & Long, Inc. v. Scattered Corp.* (7th Cir. 1995) 47 F.3d 857, 863.) Unfortunately, the show is a hit and the scam is exposed.

11

criminal prosecution is within a lawyer's – hence his law firm's – business. (*Id*. at p. 390.) *PCO* is a far cry from this case, because all the malfeasance here occurred before Turpin made his capital contribution, and because he didn't actually make his capital contribution with Fuller's money (unlike the law firm in *PCO*, which itself was paid from looted dollars).

Finally, any suggestion on this record that Fuller might have a fraudulent transfer claim is defeated by the testimony showing Turpin received equivalent value for his $102,000 contribution by way of his share of the equity in the Corona Del Mar property, namely Turpin's equitable share of the property. By its very terms, the fraudulent transfer statute does not apply when the transferor receives equivalent value for a transaction.[12] Had the Orange County property market not crashed in the fall of 2008 and into 2009, and had prices continued to appreciate as they had in the go-go mid-aughts, Fuller would no doubt have been quite happy to have stepped into Turpin's shoes and assumed Turpin's right to an equal share of the profits of the Corona Del Mar lot.

---

[12] Civil Code section 3439.04, subdivision (a) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (1) With actual intent to hinder, delay, or defraud any creditor of the debtor. [¶] (2) *Without receiving a reasonably equivalent value in exchange for the transfer or obligation*, and the debtor either: [¶] (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; [¶] (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they become due." (Italics added.)

12

DISPOSITION

The judgment is affirmed.  Neyenhuis is to recover his costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.