Filed 10/13/15  P. v. Patton CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN DWAYNE PATTON,<br><br>    Defendant and Appellant. | B258680<br><br>(Los Angeles County<br>Super. Ct. No. GA092547) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teri Schwartz, Judge.  Affirmed as modified with directions.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant, Justin Dwayne Patton, of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4))[1] and attempted criminal threats (§§ 664, 422, subd. (a)). Defendant admitted an allegation he sustained a prior conviction within the meaning of sections 667, subdivision (d), and 1170.12, subd. (b) was true. He was sentenced to eight years in state prison. We modify the judgment and affirm it as modified.

# II. BACKGROUND

## A. The April 1, 2014 Preliminary Hearing

The victim, Kayland Quilling, testified at the April 1, 2014 preliminary hearing. Ms. Quilling was a reluctant witness who claimed not to remember any details of the incident. She denied that defendant had hit her. On cross-examination she testified she did not sustain any injuries. She said it was possible she had thrown herself on the ground.

## B. The June 5 and 30, 2014 Hearings

On May 5, 2014, the district attorney's office mailed a subpoena to Ms. Quilling at an Altadena address. The subpoena was for a June 5 court date. Ms. Quilling appeared in court on June 5. She was ordered to be on call to the prosecutor. Ms. Quilling acknowledged the order and her intent to comply. Ms. Quilling's telephone number was provided to the deputy district attorney, Alice Kurs. Ms. Kurs later advised the trial court about the June 5, 2014 discussion with Ms. Quilling: "[O]n June 5th I did get a most

---

[1] Further statutory references are to the Penal Code except where otherwise noted.

recent phone number for Miss Quilling that she gave me that date and explained to her the whole process of being on call and that I would be calling her. I needed her to call me back."

On June 12, 2014, the district attorney's office mailed an on-call subpoena to Ms. Quilling at the Altadena address. The subpoena referenced a Monday, June 30 court date. Ms. Quilling's grandmother, who lived at the Altadena location, opened the subpoena by accident and so advised the district attorney's office. Between June 12 and 30, multiple calls were placed to three different telephone numbers in attempts to contact Ms. Quilling. Ms. Kurs represented that she also left two voicemail messages for Ms. Quilling. Ms. Quilling did not respond. There is no reporter's transcript of the June 30 hearing in the record on appeal. The minute order of that date indicates, "Cause is called for trial and trailed . . . ." The trial court set a July 3 trial date.

### C. Attempts to Locate Ms. Quilling

On Tuesday, July 1, 2014, the day after the June 30 hearing, in the late afternoon, Investigator Clifford Auldridge was assigned to locate the victim. Ms. Quilling's Department of Motor Vehicle records listed two addresses—the Altadena residence and another in Lancaster. On Wednesday, July 2, at 11 a.m., Investigator Auldridge went to the Lancaster home. Investigator Auldridge knocked repeatedly and rang the doorbell several times. There was no response. He observed the home for 35 minutes. There was no activity. Investigator Auldridge left the area but returned at 1:10 p.m. He observed the house for 30 to 45 minutes. There was no activity. He knocked on the door. There was no answer. Investigator Auldridge returned to the Lancaster residence on Thursday, July 3, 2014, at 6:45 a.m. Ms. Quilling's mother, Luvena Quilling, answered the door. Investigator Auldridge testified as to the July 3, 2014 discussion with Ms. Quilling's mother: "She informed me that Kayland did not live with her at that . . . address and that she in fact lived in Altadena with a friend. She did not know the friend's address and did

3

not know the friend's phone number, did not have any contact information she can give me regarding Kayland."

The parties were before the trial court later that day, Thursday, July 3, 2014. The matter was continued to Tuesday, July 8, 2014, to begin jury selection. At that time, the trial court would consider the prosecutor's due diligence evidence concerning attempts to locate Ms. Quilling.

Also on Thursday, July 3, 2014, Investigator Sigfrido Guerra went to the Altadena address. This was the address at which Ms. Quilling had received her first subpoena. Investigator Guerra spoke with Ms. Quilling's grandmother. Investigator Guerra described their conversation, "She basically told me she hadn't seen her granddaughter in a couple of weeks and that she would take my information, my business card, and if in case she contacted her, she would give her my info."

Investigator Guerra returned to the Altadena home on Monday, July 7, 2014, at 3 p.m. He knocked on the door. There was no answer. On Tuesday, July 8, at 6:10 a.m., Investigator Guerra visited the Altadena location for a third time. The grandmother answered the door. Investigator Guerra described the conversation with Ms. Quilling's grandmother: "[A]nd again she told me that she hadn't heard from her, from the witness, and that she believed she hangs out in the area with friends. And she didn't have a good cell phone number for her, but she said as soon as she hears from her, she will get the word out that I was looking for her." Also on the morning of July 8, Investigator Guerra spoke with Ms. Quilling's sister. Investigator Guerra related the conversation with Ms. Quilling's sister: "[S]he was saying that possibly [the] witness is with her father in either Orange County or San Bernadino; she wasn't sure. She didn't have a good contact cell number for her." Investigator Guerra located an Orange County address associated with the father. Investigator Guerra called that residence. The father was not present nor had he been there. Mr. Guerra also searched the websites of the Los Angeles, San Bernardino and Riverside County sheriff's offices for information concerning Ms. Quilling to no avail.

4

## D. The July 10, 2014 Trial

The trial began on July 10, 2014. Over defendant's objection, Ms. Quilling's preliminary hearing testimony was admitted at trial pursuant to Evidence Code section 1291, subdivision (a)(2). In addition, three eyewitnesses—Maria Gatmaitan, Luis Carrillo and Joe Brown—described defendant's attack on Ms. Quilling. The attack lasted at least eight minutes. Mr. Carrillo videotaped a portion of the encounter with his cellular telephone. The videotape was played for the jury. According to the three eyewitnesses, defendant and Ms. Quilling were arguing. Defendant repeatedly and continually hit, slapped and kicked Ms. Quilling. He forced her to the ground and held her down. He yelled at her aggressively. Defendant said, "Bitch, because of you, I'm going to jail." Defendant also yelled: "Fucking bitch, I'll kill you. I'll kill you, fucking bitch." Ms. Quilling was crying. She was screaming in pain and fear. She yelled for help. She repeatedly asked defendant to stop. She tried to get away. Ms. Quilling saw Ms. Gatmaitan. Ms. Quilling asked Ms. Gatmaitan to telephone an emergency operator. Defendant did not stop assaulting Ms. Quilling until sheriff's deputies, including Deputy Osbaleo Zavala, arrived.

Deputy Zavala spoke with Ms. Quilling. Ms. Quilling told Deputy Zavala that defendant had taken her phone and they were arguing about it. Deputy Zavala testified: "[She told me] that [defendant] then pushed her down to the ground and began kicking her on the head and on her back while she was on the ground, and he was standing over her. [¶] . . . [¶] . . . He then, while she was on the ground, he then dragged her by the hair . . . about 20 to 30 feet, and he . . . continued to hit and kick her in the back [and] on her head. [¶] She was also saying that through the whole time, she kept saying 'stop, stop hitting me' and she was begging him to stop. [¶] . . . [¶] . . . She said that he stopped once he saw that [law enforcement officers] had arrived." Deputy Zavala described Ms. Quilling as "in shock." He did not see any injuries on her body other than possible scrapes on her hands. Ms. Quilling said her head hurt because defendant had

pulled her hair. She also said she had a little bit of pain in her back. She declined to be treated by paramedics.

Ms. Quilling also gave a written statement: "Justin said he had my phone and is not giving it back. He snatched my hair and dragged me onto the floor. I begged him to please let me go. I just wanted my stuff. He continued to try and hit and kick me. I cried and begged him to stop and release my hair, but he kept going. I felt a little pain . . . in my head from getting my hair pulled, but I'm fine now. . . . And we have . . . an 11-month old together."

III. DISCUSSION

A. Reasonable Diligence

The sole issue on appeal is whether the prosecution made a good faith effort to secure Ms. Quilling's presence at trial. Our Supreme Court has held: "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. (*Barber v. Page* (1968) 390 U.S. 719, 724–725 (*Barber*).) The United States Supreme Court has described the good-faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.' (*Ohio v. Roberts* (1980) 448 U.S. 56, 74, disapproved on another point in *Crawford v. Washington* (2004) 541 U.S. 36, 60–68.) [¶] Our Evidence Code features a similar requirement for establishing a witness's unavailability. Under [Evidence Code] section 240, subdivision

6

(a)(5) . . . , a witness is unavailable when he or she is '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'"' (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.) Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' (*People v. Wilson* (2005) 36 Cal.4th 309, 341 [relying on *Cromer, supra,* 24 Cal.4th at p. 904].) In this regard, 'California law and federal constitutional requirements are the same.' (*People v. Valencia* (2008) 43 Cal.4th 268, 291–292.) [¶] . . . [¶] As indicated, to establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented. (*Ohio v. Roberts, supra,* 448 U.S. at p. 74; *People v. Smith* (2003) 30 Cal.4th 581, 609 (*Smith* ).) We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard (*Cromer, supra,* 24 Cal.4th at p. 902), and independently review whether the facts demonstrate prosecutorial good faith and due diligence (*id.* at pp. 902-903)." (*People v. Herrera* (2010) 49 Cal.4th 613, 622-623; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 674-675.)

Efforts to locate Ms. Quilling began immediately after the June 30, 2014 hearing. It was at that point clear she might not appear for trial. And repeated efforts to reach her by telephone had failed. Prior to that time, Ms. Kurs knew Ms. Quilling was a reluctant witness. As noted, Ms. Quilling failed to respond to the June 30 subpoena. Until that point, Ms. Kurs had no reason to believe Ms. Quilling would not appear to testify. Ms. Quilling had appeared at the preliminary hearing. Ms. Quilling had appeared at the June 5, 2014 hearing. Ms. Quilling had acknowledged she was obligated to testify and was placed on call. Ms. Quilling had provided Ms. Kurs with a telephone number. After the June 30, 2014 hearing, with trial set to start only three days later, investigators went repeatedly to each of the two addresses listed in Ms. Quilling's Department of Motor

7

Vehicles records. They spoke with Ms. Quilling's grandmother, mother and sister. They attempted to locate Ms. Quilling's father. They searched sheriff's department records in three counties to determine whether Ms. Quilling was in custody. Moreover, as discussed below, Ms. Quilling's testimony at trial was not crucial. These facts demonstrate the prosecution acted in good faith and exercised reasonable diligence in attempting to secure Ms. Quilling's presence at trial under the circumstances.

Even if the prosecutor failed to exercise due diligence in locating the victim, any error was harmless beyond a reasonable doubt. The prosecution's case rested on the testimony of the three eyewitnesses and Deputy Zavala as well as the videotape. That evidence overwhelmingly supported defendant's conviction. The victim's preliminary hearing testimony did not further the prosecution's case in any significant way. No defense witnesses were called to testify. Any alleged error was harmless beyond a reasonable doubt.

## B. Presentence Custody Credit

The trial court granted defendant 144 days of presentence custody credit and 144 days of conduct credit. However, defendant was arrested on March 2, 2014, and sentenced on July 24, 2014. Therefore, he was entitled to a presentence custody credit of 145 days. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) The judgment must be modified and the abstract of judgment amended to so provide. (*People v. Chilelli* (2014) 225 Cal.App.4th 581, 591; *People v. Morgain, supra,* 177 Cal.App.4th at p. 470.)

Defendant asserts he is also entitled to 145 days of conduct credit. However, pursuant to section 4019, subdivisions (b), (c) and (f), defendant is entitled to two days of conduct credit for every two days spent in local custody. In other words, conduct credits are given in two-day increments. (*People v. Whitaker* (2015) 238 Cal.App.4th 1354, 1358; *People v. Chilelli* (2014) 225 Cal.App.4th 581, 588; *People v. Smith* (1989) 211

Cal.App.3d 523, 527.)  Defendant is not entitled to conduct credit for the extra day. (*Ibid; People v.Chilelli, supra,* 225 Cal.App.4th at p. 588.)

## C.  Court Facility and Security Assessments

The trial court imposed a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) and a $40 court security assessment (§ 1465.8, subd. (a)(1)).  However, the court was required to impose those assessments as to both counts 1 *and* 4 even though count 4 was stayed.  (*People v. Sencion* (2012) 211 Cal.App.4th 480, 484; *People v. Crittle* (2007) 154 Cal.App.4th 368, 370-371.)  The judgment must be modified and the abstract of judgment amended to so provide.

## IV. DISPOSITION

The judgment is modified to reflect $60 in court facilities assessments (Gov. Code, § 70373, subd. (a)(1)) and $80 in court security assessments (Pen. Code, § 1465.8, subd. (a)(1)), and to reflect 145 days of presentence custody credit. The judgment is affirmed in all other respects. Upon remittitur issuance, the superior court clerk is to prepare and amended abstract of judgment and deliver a copy of the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.

We concur:


MOSK, J.


KRIEGLER, J.

10