Filed 6/25/14  P. v. Gharrirassi CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048149 |
| v. | (Super. Ct. No. 11CF0982) |
| AMIR GHARRIRASSI, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　　\*　　　　\*

## I. INTRODUCTION

Dr. Amir Gharrirassi appeals from his conviction of six counts of insurance fraud:  two counts each for writing reports about three young men to the effect he treated each of them 36 times when the jury found he treated each man only once.[1]  The reports said each man received the exact same treatment, on the same days, over a span of about four months.  The three men, however, testified they had each only seen Dr. Gharrirassi one time.

Gharrirassi's argument that there is no substantial evidence of fraud appears to rely on evidence that $6,500 was paid out by an insurer to the mother of one of the men, combined with that man's testimony he got *nothing*.  Gharrirassi seems to be saying the discrepancy necessarily undermines all three men's testimony they were treated only once.  As we explain below, the argument is a non sequitur.

Gharrirassi also argues that his constitutional right to testify was violated when his attorney did not call him to the stand and the court did not seek an express waiver of his right to testify.  The facts behind this argument are that at a *Marsden*

---

[1]  Gharrirassi was convicted under two different subdivisions of the same statute, Penal Code section 550, for each of the three men, but for one thing:  submitting fraudulent written reports.  The first subdivision is subdivision (a)(5):

"(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:  [¶] . . . [¶]

"(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim."

The second subdivision is:

"(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:  [¶] . . . [¶]

"(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact."

There is no Penal Code section 654 issue in this appeal.  Gharrirassi got probation on the condition he serve 365 days in jail.  He was also ordered to pay $19,500 in restitution.

Gharrirassi was also convicted of a seventh count, practicing chiropractic medicine without a license but raises no challenge to that conviction in this proceeding.

All statutory references in this opinion are to the Penal Code.

hearing[2] Gharrirassi expressed a desire to testify only so long as his prior convictions could not be used against him. There was no "express," unconditional statement on Gharrirassi's part that he wanted to testify regardless of any potential for impeachment. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1332-1333 ["It does not appear that an express conflict between counsel and defendant had emerged. [Citation.] Accordingly, the trial court was not obligated expressly to advise defendant of his right to testify, or to obtain his personal waiver of that right."].) Here, the court found Gharrirassi's prior convictions for drug offenses to be admissible, and gave him ample time to weigh the pros and cons of taking the stand. After its ruling, there were still two prosecution witnesses to go, and after that, at least two witnesses for the defense. But Gharrirassi sat silent as the rest of the case proceeded, including when his counsel rested after calling two witnesses on his own behalf. So, given the peculiar facts of this case, it is a reasonable inference he waived his right to testify.

## II. FACTS

A. *General Background*

The charges against Gharrirassi stem from an auto accident in which three young men, Kaysaun Franklin, Timothy Groeschel, and Joshua Walker, were all injured. A pick-up truck broadsided a Honda Civic at an intersection in Anaheim. Franklin's mother Mitra Ensani recommended all three young men see a chiropractor in the aftermath of the accident, and it is a reasonable inference, based on the fact Ensani herself often was treated by Gharrirassi, that she recommended Gharrirassi to be that chiropractor.[3] Gharrirassi prepared billing statements, allegedly showing multiple treatments when he only saw each of the young men once. The alleged fraud came to

---

[2]      After *People v. Marsden* (1970) 2 Cal.3d 118. The point of a *Marsden* hearing is to air conflicts between a defendant and his appointed counsel. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1119 [possible conflict over whether defendant should testify].)

[3]      Ironically, Gharrirassi was also convicted of practicing chiropractic without a license based on his treatment of Ensani in 2010 when his license had been revoked in 2008. As mentioned, he does not challenge his conviction on that count in this appeal.

3

light when Ensani later complained to the district attorney's office that somehow the subsequent insurance money never got to her son and his friends, and an office insurance fraud investigator began inquiring into the circumstances of Gharrirassi's treatment of the three men.

B. *Facts Bearing on Gharrirassi's Possible Wish to Testify*

After the investigation by the prosecutor's office, Gharrirassi was charged with six counts of insurance fraud.[4]  But on the day the case was called for trial, January 15, 2013, there was a *Marsden* hearing concerning the possibility of Gharrirassi's testifying on his own behalf.  We recount the salient portion in detail.

Gharrirassi requested the hearing.  He began with:  "Your Honor, I want to take a stand because of my past.  I got arrested, long time ago, in 1995 . . . ."  He then requested a new attorney.  The colloquy went like this:

"THE DEFENDANT:  I want to change the attorney, and I just recent change attorney because of the few people I asked to get subpoena.

"THE COURT:  Okay, hang on.

"So you're asking me to relieve Ms. Kim, as your attorney, and appoint new counsel for you?

"THE DEFENDANT:  Yes, Your Honor.

"THE COURT:  And you feel she has not adequately represented you?

"THE DEFENDANT:  For few people, I only get subpoena; she is willing not to do that because impeachment.  It is important for my case to get subpoena.  These few people, I work with them undercover.  Because of them, I went to jail to protect my profession  . . . ."

Dr. Gharrirassi then said he wanted to have a new attorney because his current attorney did not want certain witnesses to testify about prior, prostitution-related

---

[4]  We go into the substantive evidence of fraud in more detail in part IIC, below.

4

offenses.  But the court interjected, "The only thing I have been told about your prior record, from your attorney and from the District Attorney, is, I believe, there were – as I recall, Ms. Kim, too – Health & Safety Code convictions from about 20 years ago. [These were drug charges, not prostitution-related.] [¶] . . . . [¶] And that's the only issue that I recall the District Attorney raising.  But any undercover aspect of you going to jail merely as a ruse or a subterfuge, working in conjunction with law enforcement, that hasn't been raised by anybody; and I've made no ruling that such evidence is going to come into court."

Talking about two drug-related convictions based on section 11352 of the Health & Safety Code, the following conversation ensued:

"THE COURT:  The District Attorney indicated that she wanted to bring those up, if you took the witness stand.  I've made no ruling on that.  And in fact, we will have a formal hearing on that issue tomorrow morning, if necessary.

"THE DEFENDANT:  That's – *as long as don't use against me,* I want to take the stand.  I want to find the truth.  You want to find the truth, Your Honor; that's why I'm here."  (Italics added.)

Ultimately, the trial court denied Dr. Gharrirassi's request for substitution of counsel, finding "there has not been a breakdown in the relationship between them that would make it impossible for her to effectively represent Mr. Gharrirassi."

The next morning the court heard arguments as to whether the prior felony drug convictions could be admitted if Gharrirassi took the stand.  The court declined to rule on the motion at that time and waited until the end of the presentation of the prosecution's case.

Toward the end of the prosecution's case-in-chief – there were still two prosecution witnesses to go – there was an out-of-jury conversation between the court and counsel in which the topic of Gharrirassi's prior convictions came up.  Much of the conversation involved the trial court inquiring of the prosecutor as to how she was going

to prove his practicing without a license without violating the hearsay rule. The upshot was that two felony drug convictions would be admissible *if* Gharrirassi took the stand. The prosecution then went on with its case, calling both the insurance adjuster and then the investigator from the district attorney's office.

The prosecution rested and Gharrirassi then presented two witnesses of his own. One testified he had seen the three young men "several times" at Gharrirassi's office while the other said he saw Ensani bring "three guys" to the office "about three, four maybe five times." When the defense rested, there was nary a whisper of an indication Gharrirassi wanted to testify in his own behalf.

C. *Fraud Evidence*

The day after this accident on August 16, 2007, a senior claims adjuster for Bristol West received a call about the accident from someone identifying herself as "Kathy Grigg," who was apparently related to the driver of the pick-up. By the end of August, one of the victims of the accident, Franklin – or someone claiming to be Franklin – had called Bristol West, and the claims process got started. In that conversation the claims adjuster told "Franklin" that she needed medical reports before she could pay on the claim.

By the end February 2008, the adjuster received three sets of medical records that all came in at the same time (trial exhibits 5, 11 and 19) from "Pure and Simple Chiropractic," Gharrirassi's office. Based on those three documents, the adjuster settled with individuals claiming to be Walker, Groeschel and Franklin, for $6,000, $7,000, and $6,500 respectively. All three checks were sent to the same Irvine address because they (or someone claiming to be them) told the adjuster they were roommates.

While Gharrirassi did not take the stand at his trial, he did tell an investigator from the district attorney's office that the medical records were indeed his reports and contained his signature. When the investigator searched Gharrirassi's office under the authority of a search warrant, he was not able to find any files pertaining to any

6

of the three men. Gharrirassi's explanation was that he gave the medical records over to Ensani and her husband Nateghi, because they were going to negotiate with the insurance company directly. He also told the investigator he was paid $2,700 for his services.

But the documents submitted to the adjuster were suspicious on their face. The adjuster noted Walker and Groeschel were treated "on the same exact days" with the "same treatment." *Each* was treated 36 times. Walker, Groeschel and Franklin, however, would each later testify that he saw Gharrirassi only once, and then for no more than an hour. And each denied having had any communication with the insurance company at all.

At trial, two defense witnesses testified that they had seen Franklin, Groeschel and Walker, along with Franklin's mother, at Dr. Gharrirassi's office a few times. The first witness, Sadri Hossain, was a former patient of Gharrirassi's. The second witness, Abbas Alimohammadi, was a friend of Dr. Gharrirassi who lived above one of Dr. Gharrirassi's offices.

## III. DISCUSSION

### A. *Right to Testify*

Our recounting of the *Marsden* hearing establishes this: Any desire on Gharrirassi's part to take the stand was entirely *conditional* on his not being impeached with his prior felony drug convictions. When that condition wasn't satisfied, i.e., the judge ruled the drug convictions could be used, Gharrirassi chose not to testify.

The real issue here is the degree to which a trial court must pursue the bare possibility that a defendant *might* want to testify. It is an easy question. The basic framework has been summarized in *United States v. Joelson* (9th Cir. 1993) 7 F.3d 174, 177: "An accused's right to testify is a constitutional right of fundamental dimension. . . . Because the right is personal, it may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional. . . . [¶] Although the ultimate decision whether to testify rests with the defendant, *he is presumed*

7

*to assent to his attorney's tactical decision not to have him testify. . . .* The trial court *'"has no duty to advise the defendant of his right to testify, nor is the court required to ensure that an on-the-record waiver has occurred."'* . . . Rather, *if the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer. . . .* Thus, waiver of the right to testify may be inferred from the defendant's conduct and *is presumed from the defendant's failure to testify or notify the court of his desire to do so. . . ."* (Italics added, citations omitted.)

There is nothing in this record to rebut the presumption established by Gharrirassi's actual failure to testify. He remained silent when the trial court ruled his prior drug convictions were admissible if he did testify. He remained silent when his counsel rested. (Accord, *Williams v. Moore* (E.D. Cal. 2007) 2007 WL 1521026 at p. 25 ["Petitioner stood by silently while defense counsel advised the court that the defense rested"].)

*Bradford, supra*, 15 Cal.4th 1229, 1332-1333, is on point. There, the defendant vacillated as to whether he wanted to testify. The last word was apparently no. At that point the trial court informed counsel "it would await any further expression from defendant as to his intent." But then "the defense immediately rested and defendant made no comment." Under those circumstances, our high court held "the trial court was not obligated expressly to advise defendant of his right to testify, *or to obtain his personal waiver of that right.*" (*Id*. at p. 1333, italics added.)

Here, the main difference with *Bradford* is that Gharrirassi had more time to consider his decision. Gharrirassi was able to wait until after the prosecution case and two witnesses had been called in his defense and then he did nothing when his counsel rested. His rights were not violated.

B. *Substantial Evidence of Fraud*

Gharrirassi's substantial evidence argument goes like this: Franklin testified he never got paid the $6,500 for which he supposedly settled with the pick-up driver's insurer. His mother and her husband had told him they would handle dealings with the pick-up driver's insurer. And Franklin testified he trusted mother to handle their case. However, there is also evidence that Franklin's mother grabbed the $6,500 and used it – as the opening brief puts it – "for the payoff of everyone." So, for example, while Walker said he didn't get *any* of the money, even the district attorney's investigator thought Walker's statement a lie. That is, Walker got *some* money. Moreover, the district attorney's investigator offered "unchallenged" evidence that Franklin's mother *did* receive $6,500, and it is logical to conclude that she gave *some* money at least to Walker, or perhaps even to "all three boys." Therefore, says Gharrirassi's brief, there is no credible evidence Gharrirassi did not treat the "boys for their injuries."

We believe we have accurately paraphrased Gharrirassi's argument, but if there is any doubt, we reproduce the salient five paragraphs in the margin.[5] After these factual predicates, Gharrirassi then delivers what he hopes is the legal point that ties it all together: "[W]here the People rely upon a statement to prove a part of their theory of the

---

[5]    Here they are:
"Here, since the People proffered unchallenged testimony from D.A. Investigatory Choo that Franklin's mother did get his money, they cannot rely on Franklin's testimony that his mother was looking into what happened to his money to prove their case.
"However, if Ensani did get paid the $6,500, and did give some money to Walker, or did give some money to all three boys (i.e., Walker, Groeschel and her son, Franklin), then the entire prosecution theory of this case is cast in a new light fraught with substantial and reasonable doubt.
"If, as Choo testified, Ensani (who after all reported this crime) actually received the $6,500 from Nateghi (who forged the releases and received all the money), and if, as Choo testified, Walker's claim he got nothing is not true, then there is no credible evidence that Appellant did not treat the boys for their injuries.
"No one, not even the Prosecution, claim that the boys were not actually injured, and Officer Conklin certainly believed they were, as he testified. No one has offered any evidence as to why those injuries and pain subsided if, as the boys were persuaded to claim, they were never treated by anyone, other than the one and only visit they made to Appellant's office.
"Franklin testified at length that he trusted his mother, but not Neteghi. He claims he never got any money for the rental car claim, and never got any money for pain and suffering.

9

case, they may not disavow that statement to prove the defendant is guilty of the crime, absent some well-established circumstance to the contrary. [Citations.]" Gharrirassi then goes on to assert that he could have *discounted* his bill in view of the possibility of a "personal injury settlement that [was] lower than expected," so, yes, "the boys were treated as claimed" and hence Gharrirassi committed no insurance fraud.

It may indeed be the case that Franklin's mother intercepted checks intended for Franklin, or Franklin and Walker together, and then – honor-among-thieves-and-all-that – kept some or all of the money for herself. Perhaps, as the opening brief appears to suggest, Ensani did indeed pay Gharrirassi $2,700 for his services in preparing three reports needed for submission to an insurer. But none of that affects the basics of the case: All three young men unequivocally testified Gharrirassi had treated them only once, and there is no dispute that Gharrirassi prepared medical statements obviously intended for use in adjusting the insurance claims that claimed he treated them *36 times each*. No matter what *price* he may have put on each treatment, there is no doubt he claimed a total of 36x3 = 108 treatments.

The jury could reasonably conclude that *most* of those treatments, maybe as many as 105 of them, were fictitious. It beggars credulity to think that two young men are going to hang around a chiropractor's office *on each of 36 separate days*, waiting for a third in the party to receive treatment before it was their turn. The sheer difficulty in coordinating their schedules is presumptive evidence the medical records were falsified (and badly so) to claim treatments that were never given. But that is ultimately beside the point. The point is three witnesses testified to three treatments and appellant reported 108.

We now come to the legal underpinning of Gharrirassi's argument – the idea that "where the People rely upon a statement to prove a part of their theory of the case, they may not disavow that statement to prove the defendant is guilty." The

10

proposition is not accurate, not supported by the cases that are supposed to stand for it, and in any event inapplicable to this case.

*People v. Estrada* (1923) 60 Cal.App. 477 reversed a murder conviction because all the evidence, including the prosecution's, pointed to self-defense and there was a specific statute, section 1105 (repealed later in 1989) that said if homicide by the defendant is proved, the burden is on the defendant to justify the killing "unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." (*Id*. at p. 482, italics omitted.) Since the prosecutor's own proof showed "a case of justification, and there is nothing in any of the other evidence presented which in anywise tends to contradict or dispute defendant's version of the affair" (*id*. at p. 483), the court reversed.

*People v. Salaz* (1924) 66 Cal.App. 173, also relied on former section 1105 and also reversed based on the prosecutor's own proof: "Since, therefore, the proof on the part of the prosecution tends to show that the act of appellant was justifiable, there was, at the close of the people's case, no presumption against the accused that he had committed an unlawful homicide." (*Id*. at p. 181.)

*People v. Toledo* (1948) 85 Cal.App.2d 577 was yet again another self-defense murder case reversed in reliance on former section 1105, except that in 2009 our Supreme Court made it clear *Toledo's* only application is to cases where there is *no other evidence* showing guilt than the defendant's own statement: "Defendant contends the trial court erred in refusing to give a special instruction concerning the weight and impact of his statement to the police. Defendant asked the trial court to instruct the jury that '[t]he prosecution, having presented defendant's statement in order to prove their case, are bound by that statement and its explanation for the conduct in the absence of proof to the contrary.' This proposed instruction was based upon the so-called *Toledo* doctrine [citations], concerning which we have observed: 'The courts may sometimes say that the prosecution is "bound by" extrajudicial statements of defendant which are introduced by

11

the prosecution and which are irreconcilable with guilt, *but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt.*'" [Citation.] Moreover, we noted, if there is any "'"well-established circumstance"'" that is "'"incompatible"'" with the defendant's exculpatory statement, then the jury may consider all the evidence in determining whether to convict." (*People v. Burney* (2009) 47 Cal.4th 203, 248, italics added.)

*People v. Coppla* (1950) 100 Cal.App.2d 766 was a bit different – the prosecution of an alleged bookie. Even so, like *Toledo*, it is limited to cases where there is no other evidence except the defendant's own statement: "There is no evidence that the writing on the envelopes, or on any of the material, was that of defendant. Without such evidence, it must be presumed that it was not in his handwriting. The prosecution having presented as a part of its case *the statement of the defendant that he did not know what the sealed envelopes contained, is bound by that evidence in the absence of proof to the contrary*. [Citation.] *There was no proof to the contrary*." (*Id*. at p. 769, italics added.)

And, finally, *People v. Collins* (1961) 189 Cal.App.2d 575, was yet again a riff on a self-defense defense under former section 1105: "If the evidence introduced by the People tended to show justification, defendant was not required to introduce again the same evidence in order that he benefit by it. . . . *If the proof on the part of the prosecution tended to show that the homicide was justifiable, there was no duty on defendant to justify it.* (Pen. Code, § 1105 [other citations].)" (*Id*. at p. 589, citing *Toledo, supra*, 85 Cal.App.4th at p. 581, italics added.)

The absolute most that can be wrung, sopping wet, out of the cases that are the lynchpin of Gharrirassi's argument, is that if the prosecution's case depends on otherwise exonerating statements by the defendant, and there is no *independent* evidence of guilt, the proof is not sufficient. That is simply not our case.

We return to the topic of the substantial evidence of guilt. On our own motion, this court obtained the three documents that were the core of the prosecution's case, trial exhibits 5, 11 and 19 – the statements prepared by Gharrirassi for ultimate submission (apparently by Ensani) to Bristol West. They are *so* obviously false that it is an interesting legal question whether, just looking at them on their face, they are sufficient by themselves to justify a conviction for insurance fraud. The three exhibits state that all three young men all gave *exactly* the same statements with regard to self care and personal hygiene, physical activity, functional activities, travel and sleep. They relate each one of them had the same resting pulse rate of 72 beats per minute. And they all claim that all three young men had exactly the same treatments on exactly the same day every time they came in.[6]

All three documents are the obvious product of the block-and-paste function of computer modern word processing programs. Even if the jury were inclined to doubt *part* of the stories told by the three young men, given the transparency of the three reports, they were certainly justified in believing them to the extent that none of them received *all* 36 treatments claimed. (See *People v. Maxwell* (1979) 94 Cal.App.3d 562, 576 [""'The jury might have rejected all her testimony had they seen fit, in view of her admitted contradictions, but they were not bound to do so. Such 'testimony is still evidence in the case which they must receive and weigh. While they may reject it, they may, as they determine, accept as true one of the contradictory asseverations.''"]; *Pierson v. Superior Court* (1970) 8 Cal.App.3d 510, 517-519 [rejecting argument that sole prosecution witness at preliminary hearing was so impeached by his testimony at two previous preliminary hearings that the trial court could not "rely" on the witness's "present testimony"]; *People v. Ross* (1941) 46 Cal.App.2d 385, 396-397 [jury knew witness "had been impeached" and knew "they had a right to reject his testimony

---

[6]    E.g., "9/12/2007 [¶] Hot Pack (97010) $20.00 [¶] Chiropractic Manipulation (98941) $60.00 [¶] Ultrasound (97128) $25.00 [¶] Total $105.00."

entirely," but even so the question of the witness's "credibility and of the weight to be given to his testimony were to be determined solely by the jury"]; *People v. Holman* (1945) 72 Cal.App.2d 75, 89-90; [holding jury could still rely on parts of testimony of witness which was otherwise "self-contradictory"]; accord, CALCRIM No. 226 ["You may believe all, part, or none of any witness's testimony. [¶] . . . [¶] Do not automatically reject testimony just because of inconsistencies or conflicts."].)  Since the jury could easily conclude Gharrirassi prepared reports based on at least some treatments never actually given to the three young men, substantial evidence supports his convictions for insurance fraud.

## IV.  DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.